# 24-695

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

IN RE: NEW YORK CITY POLICING DURING SUMMER 2020
DEMONSTRATIONS

THE PEOPLE OF THE STATE OF NEW YORK, ADAM GRAY, JARRETT
PAYNE, KAYLA ROLON,
*Plaintiff-Appellees*,

v.

BILL DE BLASIO,
*Defendant-Appellee*,

v.

POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK,
INC.,
*Intervenor-Defendant-Appellant*.

On Appeal from the United States District Court for the Southern District of New
York, No. 1:20-cv-8924, Hon. Colleen McMahon

**BRIEF FOR INTERVENOR-DEFENDANT-APPELLANT POLICE
BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.**

BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2290
brian.kulp@dechert.com

STEVEN A. ENGEL
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York NY 10036
Tel: (212) 698-3512
steven.engel@dechert.com

*Counsel for Intervenor-Defendant-Appellant
Police Benevolent Association of the City of New York, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel in the above-captioned action certifies that the Police Benevolent Association of the City of New York, Inc. is a not-for-profit, private corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

*/s/ Steven A. Engel*
STEVEN A. ENGEL
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York NY 10036
Tel: (212) 698-3512
steven.engel@dechert.com

*Counsel for*
*Intervenor-Defendant-Appellant*
*Police Benevolent Association of the*
*City of New York, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 5

STATEMENT OF THE ISSUES ......................................................... 6

STANDARD OF REVIEW ................................................................. 7

STATEMENT OF THE CASE ............................................................. 7

    A.    Several Lawsuits Are Filed Following New York City Protests in the Summer of 2020. .................................................... 7

    B.    This Court Reverses the Denial of the PBA's Motion To Intervene so that It Can Protect its Interest in Maintaining Officer Safety. ...................................................................... 8

    C.    The Other Parties Bargain Around the PBA and Reach a Separate Settlement. .................................................................. 11

    D.    The District Court Issues a Consent Decree and Rejects the PBA's Concerns for Officer Safety. .......................................... 15

SUMMARY OF ARGUMENT ............................................................ 19

ARGUMENT ....................................................................................... 22

I.    The District Court Erred in Holding that Rule 41(a)(2) Forbade It from Considering the PBA's Interests. ........................................... 23

    A.    Rule 41(a)(2) Affords District Courts Broad Discretion To Consider the Interests of Non-Moving Parties. ............................. 24

    B.    Nothing in Rule 41(a)(2)'s Text or this Court's Precedent Limits a District Court's Consideration to Exclude the PBA's Legally Protectable Interest. ......................................................... 26

II.    The District Court Erred in Approving the Consent Decree over the PBA's Objections. ......................................................................... 31

    A.    The District Court Applied the Wrong Standard by Refusing To Consider the PBA's Interests when Assessing Whether the Consent Decree is Fair and Reasonable. ..................................... 31

    B.    The District Court Misconstrued this Court's Decision in *Citigroup*. .................................................................................. 34

    C.    The District Court Erred in Holding that the Consent Decree Would Not Disserve the Public Interest. ..................................... 37

1.      The Consent Decree Threatens Officer and Public Safety......38

2.      The District Court Wrongly Believed that It Had To Defer to the Settling Parties when Assessing the Public Interest......................................................................43

3.      To the Extent the District Court Considered the Public Interest, the Court Erred by Resolving a Battle of the Experts Without Factual Findings or an Evidentiary Hearing....................................................................45

CONCLUSION ....................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester County*,
712 F.3d 761 (2d Cir. 2013) .............................................................36

*Bhatia v. Piedrahita*,
756 F.3d 211 (2d Cir. 2014) .............................................................28

*Bus. Guides, Inc. v. Chromatic Comm'cns Enters., Inc.*,
498 U.S. 533 (1991) ..........................................................................26

*Camilli v. Grimes*,
436 F.3d 120 (2d Cir. 2006) .............................................................30

*Citizens for a Better Env't v. Gorsuch*,
718 F.2d 1117 (D.C. Cir. 1983) .......................................................32

*City of Bangor v. Citizens Commc'ns Co.*,
532 F.3d 70 (1st Cir. 2008) ..............................................................28

*Clark v. AII Acquisition, LLC*,
886 F.3d 261 (2d Cir. 2018) .............................................................35

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ...................................................................24, 33

*Cross Westchester Dev. Corp. v. Chiulli*,
887 F.2d 431 (2d Cir. 1989) .............................................................24

*Dinler v. City of New York (In re City of New York)*,
607 F.3d 923 (2d Cir. 2010) .............................................................38

*Doe v. United States*,
76 F.4th 64 (2d Cir. 2023) ...............................................................46

*Doe v. Urohealth Sys.*,
216 F.3d 157 (1st Cir. 2000) ............................................................27

*Donovan v. Robbins*,
752 F.2d 1170 (7th Cir. 1985) ........................................................33

*In re Drexel Burnham Lambert Grp., Inc.*,
995 F.2d 1138 (2d Cir. 1993) ....................................................32, 37

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................31, 35

*Emergency Recovery, Inc. v. Hufnagle*,
77 F.4th 1317 (11th Cir. 2023) ......................................................25

*Forts v. Ward*,
566 F.2d 849 (2d Cir. 1977) ..........................................................46

*Frank v. Crawley Petroleum Corp.*,
992 F.3d 987 (10th Cir. 2021) ........................................................27

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004) ................................................................37, 43

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) ............................................................7

*Giraldo v. Kessler*,
694 F.3d 161 (2d Cir. 2012) ..........................................................16

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ......................................................................35

*Ibarra v. Tex. Employment Comm'n*,
823 F.2d 873 (5th Cir. 1987) ..........................................................37

*Janus Films, Inc. v. Miller*,
801 F.2d 578 (2d Cir. 1986) ..........................................................32

*Johnson v. Lodge # 93 of the Fraternal Order of Police*,
393 F.3d 1096 (10th Cir. 2004) ......................................................43

*Jones v. Parmley*,
465 F.3d 46 (2d Cir. 2006) ............................................................38

*JTH Tax, LLC v. Agnant*,
  62 F.4th 658 (2d Cir. 2023) .................................................................. 7

*Kass v. City of New York*,
  864 F.3d 200 (2d Cir. 2017) .......................................................... 38, 42

*Kern v. Clark*,
  331 F.3d 9 (2d Cir. 2003) ................................................................... 46

*Kozlowski v. Coughlin*,
  871 F.2d 241 (2d Cir. 1989) ............................................................... 31

*Madsen v. Women's Health Ctr.*,
  512 U.S. 753 (1994) ........................................................................... 37

*Maryland v. Wilson*,
  519 U.S. 408 (1997) ........................................................................... 38

*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*,
  957 F.2d 1020 (2d Cir. 1992) ......................................... 29, 31, 32, 33

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006) ................................................................. 38

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019) ................................................................. 28

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................... 31

*New Eng. Health Care Emps. Pension Fund v. Woodruff*,
  512 F.3d 1283 (10th Cir. 2008) ......................................................... 28

*In re New York City Policing During Summer 2020 Demonstrations*,
  2024 WL 476367 (S.D.N.Y. Feb. 7, 2024) .......................................... 3

*In re New York City Policing During Summer 2020 Demonstrations*,
  537 F. Supp. 3d 507 (S.D.N.Y. 2021) ............................................... 10

*Ohlander v. Larson*,
  114 F.3d 1531 (10th Cir. 1997) ......................................................... 30

*Patterson v. Newspaper & Mail Deliverers' Union*,
514 F.2d 767 (2d Cir. 1975) ..........................................................32, 37

*Payne v. City of New York (In re New York City Policing During Summer 2020 Demonstrations)*,
27 F.4th 792 (2d Cir. 2022) ......................................................*passim*

*Paysys Int'l, Inc. v. Atos IT Servs. Ltd.*,
901 F.3d 105 (2d Cir. 2018) ........................................................27, 28

*Pedreira v. Sunrise Children's Servs., Inc.*,
802 F.3d 865 (6th Cir. 2015) ...............................................................32

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
17 F.4th 376 (3d Cir. 2021) ................................................................25

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)..............................................24, 26, 27, 30

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
10 F.4th 87 (2d Cir. 2021) ...................................................................7

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................................33

*Schall v. Martin*,
467 U.S. 253 (1984)..............................................................................40

*SEC v. Commonwealth Chem. Sec., Inc.*,
574 F.2d 90 (2d Cir. 1978) ................................................................32

*SEC v. Levine*,
881 F.2d 1165 (2d Cir. 1989) .......................................................31, 35

*SEC v. Randolph*,
736 F.2d 525 (9th Cir. 1984) .............................................................32

*SEC v. Wang*,
944 F.2d 80 (2d Cir. 1991) ................................................................32

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) ...........................................................25

*In re Sept. 11 Prop. Damage Litig.*,
    650 F.3d 145 (2d Cir. 2011) .................................................................29

*Shawmut Ass'n v. SEC*,
    146 F.2d 791 (1st Cir. 1945).................................................................27

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).......................................................................28, 29

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................................29

*Travers v. Fed. Express Corp.*,
    8 F.4th 198 (3d Cir. 2021) ..................................................................27

*U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts, Inc.*,
    673 F.3d 158 (2d Cir. 2012) .................................................................34

*U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts., Inc.*,
    752 F.3d 285 (2d Cir. 2014) ........................................................*passim*

*Union Carbide Agric. Prods. Co. v. Costle*,
    632 F.2d 1014 (2d Cir. 1980) ...............................................................23

*United States v. City of Albuquerque*,
    2020 WL 3129825 (D.N.M. June 12, 2020)........................................35

*United States v. City of Miami*,
    664 F.2d 435 (5th Cir. 1981) ...............................................................36

*United States v. Doe (In re Grand Jury Investigation)*,
    399 F.3d 527 (2d Cir. 2005) .................................................................43

*United States v. Hooker Chem. & Plastics Corp.*,
    776 F.2d 410 (2d Cir. 1985) ...................................................................7

*United States v. Napolitano*,
    761 F.2d 135 (2d Cir. 1985) .................................................................38

*United States v. New York City Hous. Auth.*,
    347 F. Supp. 3d 182 (S.D.N.Y. 2018) .................................................47

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ........................................................36

*Zagano v. Fordham Univ.*,
    900 F.2d 12 (2d Cir. 1990) ...........................................................27

*Zupnick v. Fogel*,
    989 F.2d 93 (2d Cir. 1993) .....................................................24, 28

**Statutes**

28 U.S.C. § 1291 ..............................................................................5

28 U.S.C. § 1331 ..............................................................................5

28 U.S.C. § 1367(a) .........................................................................5

42 U.S.C. § 1983 ..............................................................................5

N.Y. Executive Law § 63(1) ...........................................................8

N.Y. Penal Law § 140.17 ...............................................................39

N.Y. Penal Law § 145.00 ...............................................................40

N.Y. Penal Law § 145.05 ...............................................................40

N.Y. Penal Law § 240.05 ...............................................................39

N.Y. Penal Law § 240.06(1) ..........................................................39

N.Y. Penal Law § 240.10 ...............................................................39

N.Y. Penal Law § 240.20 ...............................................................39

**Rules**

Fed. R. Civ. P. 41(a)(1)(A)(i) .......................................................24

Fed. R. Civ. P. 41(a)(2) ...............................................23, 24, 27, 30

Fed. R. App. P. 4(a)(1)(A) ..............................................................5

Fed. R. App. P. 4(a)(2) ....................................................................5

## Other Authorities

Rich Calder, *NYC Pols Urge Federal Judge to Not Handcuff NYPD Response to Growing Protests*, N.Y. Post (Jan. 27, 2024), https://bit.ly/3wprGHO ...................................................................16

Summer Concepcion, *Biden Condemns Campus Violence: 'Order Must Prevail'*, NBC News (May 2, 2024), https://nbcnews.to/3UwNHwq..........................................................41

Nolan Hicks & Steve Janoski, *Mayor Adams Sounds Alarm on NYPD BLM Settlement as Anti-Israel Protests Rage: 'Very Troubling'*, N.Y. Post (Dec. 26, 2023), https://bit.ly/4aeZHsa...............................16

Robert Holden (@BobHoldenNYC), Twitter (Jan. 27, 2024), https://bit.ly/3wzn0iL...............................................................16, 44

Adrienne LaFrance, *The New Anarchy: America Faces a Type of Extremist Violence it Does Not Know How to Stop*, The Atlantic (Mar. 6, 2023), https://bit.ly/3USGybc..............................................41

Noah Manskar, *450 NYC Businesses Damaged During George Floyd Protests*, N.Y. Post (June 12, 2020), https://bit.ly/44ZYOTA ...........................9

Lawrence Mentz, *Voluntary Dismissal by Order of Court—Federal Rules of Civil Procedure Rule 41(a)(2) and Judicial Discretion*, 48 Notre Dame L. Rev. 446 (1972) .........................................................25

*Merriam Webster's Dictionary of Law* (2016) ........................................39

*New Oxford American Dictionary* (3d ed. 2010)....................................27

N.Y.C. Charter § 435(a).........................................................................10

Press Release, ACLU of New York, *NYCLU, The Legal Aid Society, and Attorney General James Announce Agreement with NYPD to Reform Policing of Protests* (Sept. 5, 2023), https://bit.ly/3Uyy2ww. ...............................................................2, 12

9 Wright & Miller, *Federal Practice and Procedure* § 2364 (4th ed. 2022) .................................................................................................24

## PRELIMINARY STATEMENT

In the wake of the summer of 2020, the New York Attorney General and private plaintiffs brought these consolidated actions against the City of New York ("the City") to rewrite the rules governing the policing of protests and inhibit the New York City Police Department ("NYPD") from enforcing the law during such demonstrations. These cases followed the widescale demonstrations during that COVID-era summer of 2020, which resulted in more than 400 assaults against NYPD officers and substantial damage to public and private property. New Yorkers saw such disorder repeat itself more recently following the Gaza-related protests throughout the City.

Of course, New Yorkers have a First Amendment right to peaceably assemble, and many protests remain peaceful. But it is equally true that not all protesters remain peaceful, and protests may devolve into riot, property destruction, and violence, often with little warning. When that occurs, such disorder can jeopardize the lives and safety of the citizens of New York and of the police officers who protect and serve them.

This Court previously recognized that Appellant Police Benevolent Association of the City of New York, Inc. ("PBA"), as the representative of 21,000 NYPD officers, has a legally protectable interest in this litigation. The PBA moved to intervene in 2021 based on the concern that, following the politically volatile

1

summer protests, the City might not vigorously protect officer safety in defending this litigation. The district court (McMahon, J.) denied intervention, yet this Court reversed. *See Payne v. City of New York (In re New York City Policing During Summer 2020 Demonstrations)*, 27 F.4th 792, 795 (2d Cir. 2022). As the Court explained, the PBA has a "direct, substantial, and legally protectable interest in officer safety" that was not "adequately represented" by the other parties. *Id.* at 799.

Despite this Court's decision, the district court on remand continued to treat the PBA as though it had no cognizable interest in the action. The Plaintiffs and the City of New York (the "Settling Parties") engaged in settlement negotiations in which the PBA's inputs were ignored. Eventually, they proposed a new set of rules—to be enforced as a consent decree—which the PBA believes would materially harm the very officer safety interests for which this Court had permitted intervention.

Judicial approval of the Settlement would bind the NYPD to a set of radical, laissez-faire policing methods for years to come. Plaintiffs' representatives candidly admitted that the Settlement would "represent[] a novel approach to policing protests."[1] Yet they sought to have this experiment imposed upon New Yorkers with

---

[1] Press Release, ACLU of New York, *NYCLU, The Legal Aid Society, and Attorney General James Announce Agreement with NYPD to Reform Policing of Protests* (Sept. 5, 2023), https://bit.ly/3Uyy2ww.

2

the force and rigidity of a judicial decree. Among other terms, police officers will be obliged to abide by a rigid tiered system that strictly limits their presence at protests until tensions have already boiled over. Officers will be barred from arresting rioters and others who destroy property—even for crimes witnessed in the officers' presence—unless they first obtain the approval of senior officers in the NYPD. The NYPD must seek to accommodate protesters who have taken over the streets. And they must navigate a host of other procedural hurdles that will impair real-time response efforts and place the officers themselves at risk.

For these reasons, the PBA objected to the Settlement and explained to the district court the dangers of this new, ill-considered regime. And the PBA backed up that submission with the expert opinion of a decorated former Police Chief with over 35 years of NYPD experience. Even though the City itself was a party to the Settlement, Mayor Eric Adams publicly expressed concern with the Settlement, as did a bipartisan group of City Council members, who submitted a letter urging the district court to reject it.

The district court endorsed the Settlement anyway. *See In re New York City Policing During Summer 2020 Demonstrations*, 2024 WL 476367 (S.D.N.Y. Feb. 7, 2024). In its view, the district court was obliged to defer to the settling parties and could not consider the PBA's interest in officer safety before ordering dismissal under Rule 41(a)(2). Remarkably, the court brushed aside that interest even though

3

the parties had structured the Settlement as a consent decree over which the court would maintain jurisdiction—and even though this Court had granted intervention to the PBA precisely to protect this interest. The district court's decision was patently erroneous and completely nullified the party status that this Court previously granted to the PBA.

In reaching this conclusion, the district court relied upon cases where *all* parties had agreed to a consent decree, and in so doing, wrongly refused to assess whether the consent decree's terms were fair and reasonable to the PBA. The court also declined to assess the public interest independently, instead viewing the Settling Parties' agreement as effectively dispositive of this equitable inquiry.

Worse still, to the extent the district court considered the PBA's objections, the district court rejected them by improperly resolving a battle of the experts on the cold record and dismissed the PBA's substantiated safety concerns without holding an evidentiary hearing. The PBA's expert had demonstrated that the proposed consent decree warranted amendment to ensure the safety of police officers and of New Yorkers. Yet the district court simply credited Plaintiffs' expert without conducting any kind of evidentiary hearing.

In all these ways, the district court's decision was erroneous. The district court applied the wrong legal standard at every turn. It defied the text of Rule 41(a)(2). It ignored basic principles of equity jurisdiction. And ultimately, it

4

indiscriminately wielded the federal judicial power to cement an unprecedented set of local policing policies that will endanger police officers and the public alike.

Accordingly, the judgment should be reversed.

## JURISDICTIONAL STATEMENT

The complaints in this consolidated action allege claims, among others, arising under 42 U.S.C. § 1983. *See, e.g.*, JA1109–16, 1160, 1224–30, 1313–14 (Joint Appendix). The district court thus had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). The district court granted the Settling Parties' dismissal motion on February 7, 2024, and amended the decision the following day. SA1–43 (Special Appendix). The court entered the Stipulations of Dismissal on April 17, 2024, May 15, 2024, and May 20, 2024. SA44–58. The PBA timely appealed the initial order on March 7, 2024 and filed amended notices of appeal on May 17, 2024 and May 21, 2024 to include the subsequent orders. JA315–50; *see* Fed. R. App. P. 4(a)(1)(A), (a)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

5

## STATEMENT OF THE ISSUES

1.  Whether Rule 41(a)(2) prohibits a district court from considering any interest of a non-settling party apart from the loss of a legal claim, cause or action, or contract right.

2.  Whether the district court erred in approving the consent decree as fair and reasonable without considering its substantive merits or the very interest that an objecting party's intervention was designed to protect.

3.  Whether the district court erred in holding that the consent decree would not disserve the public interest despite the decree's threats to officer and public safety.

4.  Whether the district court erred by failing to conduct an evidentiary hearing to resolve a battle of the experts over the consent decree's impact on public safety.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's interpretation of the Federal Rules of Civil Procedure. *See, e.g.*, *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 97 (2d Cir. 2021). The entry of a consent decree is reviewed for abuse of discretion. *See United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985) (per curiam). But the legal standards employed by the district court in entering the consent decree are "functionally reviewed *de novo*," because "a decision premised on a legal error is necessarily an abuse of discretion." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021). A district court also "abuses—or more precisely, exceeds—its discretion when its decision rests on" a "clearly erroneous factual finding" or "cannot be located within the range of permissible decisions." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666 (2d Cir. 2023) (quotation marks omitted).

## STATEMENT OF THE CASE

### A. Several Lawsuits Are Filed Following New York City Protests in the Summer of 2020.

This appeal involves four consolidated cases, each of which seeks injunctive and declaratory relief seeking to alter the NYPD's policing practices based upon what Plaintiffs claimed to be unlawful actions taken in response to the widespread civil disorder during the summer of 2020. SA3, 6. Three of these actions were brought on behalf of individual plaintiffs against the City, its leadership, the NYPD,

and individual police officers.[2]  SA6.  Each of these plaintiffs had attended the large-scale protests during the summer of 2020 following the death of George Floyd in Minnesota.  *Id.*  And they claimed that the defendants violated the U.S. Constitution and state law in their handling of the protests.  *Id.*

The fourth action was filed by the New York Attorney General in early 2021.[3]  SA6.  Invoking the *parens patriae* doctrine and N.Y. Executive Law § 63(1), the Attorney General similarly claimed that the NYPD's policies and handling of the summer 2020 protests violated federal and state law.  SA6; JA1043.  As a result, the Attorney General sought "comprehensive prospective relief" that would alter the City's allegedly unlawful "policies, practices and/or customs and ensure that they do not continue in the future."  JA1044.

### B.  This Court Reverses the Denial of the PBA's Motion To Intervene so that It Can Protect its Interest in Maintaining Officer Safety.

The PBA is the designated collective bargaining agent for approximately 21,000 police officers who serve and protect the people of the City of New York.  *See* JA364.  Its "core mission" is "to advocate for and protect the interests of its members, the front-line police officers of the NYPD."  JA352.

---

[2] *Payne, et al. v. De Blasio et al.*, No. 1:20-cv-08924-CM (S.D.N.Y.); *Gray, et al. v. City of New York, et al.*, No. 1:21-cv-06610-CM (S.D.N.Y.); *Rolon, et al. v. City of New York, et al.*, No. 1-21-cv-02548-CM (S.D.N.Y.).

[3] *People of the State of New York v. City of New York, et al.*, No. 1:21-cv-00322-CM (S.D.N.Y.).

In responding to the summer 2020 protests, "the PBA's members were required to deal with the realities on the ground, which were far more chaotic and dangerous than the picture painted by the allegations in the complaints." JA356. Needless to say, not all of the participants conducted themselves peacefully. *Id.* Angered by the tragic death of George Floyd at the hands of a Minnesota police officer, many of the protesters spoke of defunding the police. Some individuals went further and were "clearly intent on engaging in and provoking violence against police officers." *Id.* And they "us[ed] the crowds as a hiding place and a safe harbor while they did so." *Id.*

The protests thus presented a clear threat to officer safety. Indeed, "more than 400 NYPD officers were assaulted during those events, some suffering severe injuries." *Id.* The assaults "involved attacks on NYPD officers with bricks thrown at their heads, the use of weapons to hit officers on the head and elsewhere often from behind, throwing bicycles or other objects at officers, spitting in officers' faces, punching officers, throwing them to the ground and kicking them, and other similar conduct." JA357. "There were also incidents of 'protestors' throwing Molotov cocktails at police vehicles" and other instances of "destruction and violence." JA356, 358, 374. As the riots wore on, protesters looted hundreds of businesses and caused millions of dollars of damages. *See, e.g.*, Noah Manskar, *450 NYC*

9

*Businesses Damaged During George Floyd Protests*, N.Y. Post (June 12, 2020), https://bit.ly/44ZYOTA.

Despite these "chaotic and dangerous conditions," the police officers did what they could "to restore order and maintain the peace." JA357. That included using force where necessary and making arrests. But the consolidated cases seek injunctive and declaratory relief that would limit or outright prohibit NYPD officers from engaging in such otherwise lawful conduct. In that way, the consolidated cases threaten to undermine the ability of NYPD officers to protect the public and themselves "in carrying out their responsibilities and duties." JA355; *see* N.Y.C. Charter § 435(a) (detailing the NYPD's powers and duties).

As this Court later recognized, the PBA had legitimate concerns that the City might not protect its members' interests in this politically charged litigation, and so, the PBA moved to intervene in these actions. *See In re New York City Policing During Summer 2020 Demonstrations*, 537 F. Supp. 3d 507, 510 (S.D.N.Y. 2021). The PBA asserted an interest in protecting officers' "personal safety," because "any changes to NYPD policy could put officers at increased risk when policing future demonstrations." *Id.* at 512, 516. But the district court denied the PBA's motion for intervention on the ground that the PBA had "not demonstrated a cognizable interest." *Id.* at 520.

This Court unanimously reversed.  *See Payne*, 27 F.4th at 795.  The Court held that the PBA had "identified a direct, substantial, and legally protectable interest in officer safety that may be impaired by the disposition" of the four actions at issue. *Id.* at 799.  The record "clearly shows that changes to policies affecting interactions between officers and protesters may affect officer safety."  *Id.* at 802.  "The plaintiffs in the consolidated actions seek to change [the NYPD's] policies to be more protective of the protesters and correspondingly less focused on the safety interest of the front-line officers."  *Id.*  And the PBA's "cognizable interest in officer safety" was inadequately represented by the defendants in this "high-profile, politically charged litigation seeking reforms."  *Id.* at 803–04 (quotation marks omitted).  The district court therefore "abused its discretion in denying the PBA's motion to intervene as of right in the actions seeking declaratory or injunctive relief with respect to NYPD policies."  *Id.* at 804.

### C.    The Other Parties Bargain Around the PBA and Reach a Separate Settlement.

On remand, the PBA became a party, yet its interests were once again cast aside.  As settlement talks progressed, the PBA "attended sessions of the mediation to which it was invited" and received iterative drafts of an agreement.  JA444.  And it submitted comments on those drafts raising its concerns about the impact on officer safety.  *Id.*  But "[i]ts comments received no substantive response, and no

significant changes were made to the provisions to alleviate the problems the PBA had raised." *Id.*[4]

On September 5, 2023, the Settling Parties reached an agreement without the PBA. JA376–422. The Settlement requires "extensive oversight and involvement" by the district court. SA9. Representatives for the Plaintiffs declared that the terms of the "landmark settlement" "represent[] a novel approach to policing protests." Press Release, ACLU of New York, *NYCLU, The Legal Aid Society, and Attorney General James Announce Agreement with NYPD to Reform Policing of Protests* (Sept. 5, 2023), https://bit.ly/3Uyy2ww. And the terms of this novel experiment are alarmingly divorced from the realities of policing.

The Settlement's terms jeopardize the safety of police officers and the public in several ways. *See* JA425–38, 976–80. To start, the Settlement imposes and solidifies a "Red Light/Green Light" system that "require[s] the approval of someone at the rank of Captain or above before any officer may make an authorized arrest" for a "Red Light" offense. JA386–87. Those "Red Light" offenses include "riot, incitement to riot, non-violent obstruction of governmental administration,

---

[4] The district court was thus simply wrong to suggest "the PBA did absolutely nothing in furtherance of this lawsuit or to protect any interest." SA8. And, in much the same way, the district court cited no evidence to back up its assertion that the PBA "chose to be oppositional simply to be oppositional." SA18. Nor does anything in the record support the district court's contention that the PBA was "hostile" during negotiations. SA8.

violation of emergency orders, disorderly conduct, trespass, criminal mischief 3 or 4," violation of a state law forbidding pedestrians from walking along roadways, and "unlawful assembly." JA387. The Settlement permits no exceptions to this radical policy, which encourages non-peaceful protestors to commit these frequently serious crimes and then flee into the chaos of a largescale demonstration. *See* JA387, 431.

In addition, the Settlement creates an impractical four-tier system for dealing with protests and demonstrations. JA388–94, 428–30. In Tier One, which "presumptively appl[ies]" to "all" demonstrations, the NYPD generally may not dispatch any police officers to the scene of the protest, except for "protest liaisons." JA389. And protesters may "take over [the] streets." JA982; *see* JA390. Patrol officers are permitted only where "necessary" for the limited purpose of "rerout[ing] vehicular or pedestrian traffic" to "whenever possible accommodate the demonstration." JA390. Even then, they are strictly limited in their ability to make arrests or engage in any other "enforcement activity" unless it conforms to the "Red Light/Green Light" policy described above. *Id.*

The NYPD can move to Tier Two if the "Incident Commander, in consultation with the [newly created position of a First Amendment Activity ('FAA')] Senior Executive, reasonably believes that Green Light violations are imminent," or that the protest risks obstructing access to "critical infrastructure" that "cannot be relieved by directing individuals to alternate" access points. *Id.* In that case, the

13

NYPD "may station additional officers nearby but off-scene, and to the extent possible, out of view of protesters." JA391. "[L]imited" additional officers are permitted on scene only where there is a threat of "major" property damage or violence, and there "is a presumption against the stationing of additional officers on scene." *Id.*

The NYPD can escalate to Tier Three only at the Incident Commander's behest and only "if there is individualized probable cause to arrest individuals who are engaged in Green Light offenses or authorized Red Light Offenses." *Id.* In that event, the NYPD is limited to deploying "an appropriate number of officers sufficient to address the specific individuals" engaged in arrestable offenses. *Id.* The NYPD cannot deploy additional officers to deter further crime. *See* JA391–92.

The NYPD "may only move to Tier Four if authorized jointly by the FAA Senior Executive in consultation with the Incident Commander." JA393. And, even then, the protest must have devolved into "widespread" Green Light or serious Red Light offenses, or the protesters must be "seeking to gain unauthorized entry, or physically blocking others' entry, into a sensitive location or engaged in a criminal offense of trespass in the third degree or higher." JA392–93. At Tier Four, the Incident Commander may order dispersal, subject to the FAA Senior Executive's approval, and—after certain conditions have been met—the NYPD may "initiate arresting individuals who have refused to disperse." JA393–94. Regardless, the

NYPD must allow the demonstration to continue "as close as possible" to its original location and "identify" the new location for the crowd when ordering dispersal. JA393.

In short, the Settlement significantly restricts and delays the NYPD's ability to deploy officers to protests, even though they are often characterized by chaotic and rapidly developing conditions, and police presence may be needed to deter crime in the first place. JA431–34. And the Settlement requires cumbersome consultations before decisions can be made. JA435.

Such a reactive policing model is not only doomed to failure, but it can foreseeably be expected to result in officers having to belatedly deploy to an already-dangerous situation after tensions have "boiled over," rather than having the chance to maintain order beforehand. JA431. These are serious problems for the PBA's members. The PBA submitted an expert affidavit from former NYPD Chief of Department Louis Anemone, a 35-year veteran of the Department, who explained that "[c]onfusion, chaos and serious risks of injury to police officers trying to implement this Proposed Settlement can be expected to occur." JA434.

### D. The District Court Issues a Consent Decree and Rejects the PBA's Concerns for Officer Safety.

The Proposed Settlement proved controversial. Although the City agreed to the Settlement in September 2023, just three months later, Mayor Adams stated that he "'did not agree [with] the concept of those changes'" and called its terms

15

"'troubling,'" warning that the Settlement had already "made officers 'hesitant' when responding to large, out-of-control marches . . . as the Big Apple has been rocked by fiery anti-Israel protests." Nolan Hicks & Steve Janoski, *Mayor Adams Sounds Alarm on NYPD BLM Settlement as Anti-Israel Protests Rage: 'Very Troubling'*, N.Y. Post (Dec. 26, 2023), https://bit.ly/4aeZHsa; *see* JA982–84.

"A bipartisan group of City Council members" also demanded that the district court reject the Settlement "requiring the NYPD to scale back enforcement during street protests—warning it will handcuff cops from preventing riots and make the city a more 'dangerous place.'" Rich Calder, *NYC Pols Urge Federal Judge to Not Handcuff NYPD Response to Growing Protests*, N.Y. Post (Jan. 27, 2024), https://bit.ly/3wprGHO; *see also* Robert Holden (@BobHoldenNYC), Twitter (Jan. 27, 2024), https://bit.ly/3wzn0iL (hereafter, "City Council Members' Letter").[5]

The PBA objected to the Proposed Settlement because of the significant threats it posed to officer safety. JA423, 439–58. It asked the district court to deny the request for a Rule 41(a)(2) dismissal and refuse to enter a consent decree that would jeopardize the safety of police officers, protesters, and other members of the public. JA439–58.

---

[5] Judge McMahon referred to the bipartisan group's letter on the record. *See* JA990. And the Court can "take judicial notice" of it as a "relevant matter[] of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).

But the district court disregarded the PBA's interests in preserving officer safety—just as it ignored that interest on intervention. The district court concluded that Rule 41(a)(2) did not permit it to consider the PBA's objections as a non-settling party, even if the PBA had established an "injury in fact." SA14 (citation omitted). Instead, it reasoned that the PBA must show a particular type of "legal prejudice"—specifically, the loss of "a 'legal claim, cause of action or contract rights' by virtue of the partial settlement and ensuing dismissal"—before it could be heard. *Id.* (citation omitted). Applying that test, the district court found that the PBA's "contract and collective bargaining rights are not in any way compromised by dismissal of the case." SA15.

The district court did not dispute that the Proposed Settlement could "injure[] the very interest [in officer safety] that intervention was meant to protect." SA16. But it concluded that the PBA could do no more than "have the court evaluate whether dismissal pursuant to the Settlement will subject it to 'legal prejudice,' as that term is defined above." SA17. In the court's view, then, the PBA's arguments regarding officer safety were irrelevant, and the PBA had no "right to object." SA19.

Turning to the consent decree, the district court recognized that the Proposed Settlement was in fact a proposed consent decree and evaluated whether to approve it "using the *Citigroup* standard." SA19–22, 25; *see U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts., Inc.*, 752 F.3d 285 (2d Cir. 2014). "Under *Citigroup*, a

17

reviewing court must determine 'whether the proposed consent decree is fair and reasonable, with the additional requirement that the public interest would not be disserved.'" SA25 (quoting *Citigroup*, 752 F.3d at 294).

The district court held that the proposed consent decree passed muster. The court, however, specifically "decline[d] to consider the PBA's arguments addressed to the substantive merits of the proposed Settlement," concluding that the safety-based objections were immaterial to the "fair and reasonable" inquiry. SA31–33. The district court reasoned that the PBA's arguments were likewise "not properly considered under *Citigroup*" in addressing the public-interest element, believing that the mere fact of the Settling Parties' agreement was "effectively dispositive" of the inquiry. SA34, 36.

To the extent the district court considered the public interest at all, it credited an expert report submitted by the Plaintiffs as "substantial evidence" that the court "should indeed defer" to the Settling Parties. SA34. That opinion of Hassan Aden (a former Greenville, North Carolina police chief who has no experience with the NYPD) stood in "direct contradiction" to the considered views of former NYPD Chief Anemone. SA32, 37. Even so, the court declared that Chief Anemone's expert opinion could not itself "establish a 'substantial basis in the record for concluding the proposed consent judgment' would disserve the public interest." SA36 (quoting *Citigroup*, 752 F.3d at 294). So the court resolved the battle of the

18

experts in the Settling Parties' favor without holding an evidentiary hearing. It thus approved the consent decree and ordered dismissal of the case, while retaining jurisdiction to oversee and enforce the terms of the Settlement. SA41, 44, 51, 53.

## SUMMARY OF ARGUMENT

This Court squarely held that the PBA has a legally protectable interest in this litigation, yet the district court misread the law as requiring the approval of a settlement and the issuance of a consent decree without any serious consideration of the PBA's objections.

*First,* the district court erred in refusing to consider the PBA's interest before ordering dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2). Rule 41(a)(2) affords district courts broad latitude to consider the interests of objecting parties. The Supreme Court recognized as much this past Term, emphasizing that courts should ensure that substantial justice is accorded to all parties before ordering dismissal. And this Court's precedent is to the same effect. Those decisions together impose a duty upon district courts to avoid prejudice and protect the interests of the parties before them. But the court below failed to heed that direction and believed it could assess only whether the PBA might lose a legal claim or contract right. In doing so, the district court ignored the very legal interest in officer safety that this Court found to warrant intervention.

19

Nothing in Rule 41(a)(2)'s text or this Court's precedent limits a district court's consideration to a non-settling party's loss of a legal claim or contract right. On the contrary, Rule 41(a)(2) grants the district court the power to impose "terms that the court considers proper" before ordering dismissal. Of course, a non-settling party may lack standing to object absent a showing of legal prejudice. But the PBA has standing here. In fact, this Court has already held that the PBA has a legally protectable and concrete interest in this litigation. The district court's refusal to entertain that interest disregards this Court's prior decision and constitutes a clear legal error.

*Second,* the district court committed a parallel error in cementing an ill-considered policing regime and issuing a consent decree that jeopardizes the safety of NYPD officers and the public.

The district court premised its entry of the consent decree on an erroneous legal standard. A consent decree is a settlement backed by an injunction and the power and prestige of the federal court. As such, federal courts may not act as mere rubber stamps when issuing them. Rather, the court must employ the full range of its equitable powers to scrutinize the proposed settlement's terms and ensure that they are both fair and reasonable to all and not against the public interest. The district court here failed to apply these traditional equitable principles.

The district court believed that this Court's decision in *Citigroup* compelled a different approach. But *Citigroup* was not a case where a party with a legally protectable interest objected to the entry of the consent decree, and *Citigroup* itself emphasized the flexible nature of a district court's inquiry. The district court thus erred by mechanically applying *Citigroup*'s "minimum" requirements as though they defined the bounds of the court's review.

Indeed, accepting the district court's rigid test would not only violate this Court's precedents and basic principles of equity jurisdiction, but it would also raise serious federalism concerns. The federal consent decree forces the City of New York into a novel policing experiment, empowers a federal judge to oversee its implementation, and leaves New Yorkers powerless to alter the policing regime for years. And the district court's knee-jerk approval placed the power of the federal judiciary behind that unprecedented regime without any real inquiry into its threat to public safety. At the very least, the district court was required to consider those interests when determining whether the consent decree was fair and reasonable.

Finally, the district court wrongly held that the consent decree would not disserve the public interest. New Yorkers have compelling interests in maintaining order, ensuring the public safety, protecting NYPD officers, promoting the free flow of traffic, and safeguarding their property rights. But the consent decree threatens those important interests. For example, it restricts the ability of the NYPD to enforce

the law by arresting individuals for rioting and engaging in other criminal acts of violence and property destruction.

The consent decree also ignores the reality that protests can quickly devolve into chaos, and its rigid four-tier structure for dealing with protests will inevitably undermine and delay effective response efforts by the police. The PBA documented its concerns through an evidentiary submission, and the concerns were shared by Mayor Adams and a bipartisan group of City Council members. But the district court continued to maintain that this evidence is "not properly considered under *Citigroup*," believing that it had to simply defer to the Settling Parties. That is not the law. And to the extent that the district court considered the evidence at all, it did so by wrongly crediting the Plaintiffs' expert over the PBA's expert without holding any kind of evidentiary hearing. That was erroneous as well.

For all these reasons, the district court's judgment should be reversed.

## ARGUMENT

This Court previously reversed the district court's denial of intervention on the ground that the PBA had a legally protectable interest in officer safety that it was entitled to vindicate in this litigation. Yet the district court's reading of the law renders the PBA's participation effectively meaningless.

Despite the clear directive of this Court, the district court held that the other parties could reach an agreement without the PBA and then have the court

rubberstamp that agreement, without alteration and over the PBA's objection. The purpose of the PBA's participation was to ensure that such an agreement could not be approved, and the district court erred by depriving the PBA of any meaningful right to be heard in objecting to the Proposed Settlement and resulting consent decree.

## I. The District Court Erred in Holding that Rule 41(a)(2) Forbade It from Considering the PBA's Interests.

The district court began by adopting an unduly rigid standard for resolving a Rule 41(a)(2) motion over a non-settling party's objection. Its requirement that an objecting party demonstrate the loss of a "legal claim, cause of action or contract rights" has no basis in Rule 41(a)(2)'s text or any binding precedent. On the contrary, the Federal Rules broadly permit district courts to dismiss actions on "terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). And both this Court and the Supreme Court have stressed that district courts should strive to protect the interests of non-moving parties when faced with a Rule 41(a)(2) motion. "The district court's misconception of the applicable legal standard requires reversal." *Union Carbide Agric. Prods. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980).

## A. Rule 41(a)(2) Affords District Courts Broad Discretion To Consider the Interests of Non-Moving Parties.

At the start of a case, a plaintiff need not seek court approval before it may voluntarily dismiss an action. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). But where, as here, a defendant has served an answer and the plaintiff lacks the consent of all parties, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

As the Supreme Court recently explained, "Rule 41(a)(2)'s 'proper terms' analysis focuses on the defendant's interests: The court mainly addresses whether that party's 'commitment of time and money' militates against dismissal." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 437 (2023) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990)). But time and money are not the only cognizable interests. Rather, "a court, in applying Rule 41, 'should endeavor to ensure that substantial justice is accorded to all parties.'" *Id.* (quoting 9 Wright & Miller, *Federal Practice and Procedure* § 2364 (4th ed. 2022)).

Consistent with that command, this Court has long held that district courts "have a duty to protect the rights of the parties before them" when dealing with a Rule 41(a)(2) motion. *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993). The primary "purpose of authorizing terms and conditions on a voluntary dismissal is to protect the defendant from prejudice." *Cross Westchester Dev. Corp. v. Chiulli*, 887

24

F.2d 431, 432 (2d Cir. 1989). And "the language of the Rule is unqualified." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1202 n.7 (2d Cir. 1970).

"By design," then, the Rule serves to "restrict any dismissal which unfairly affects the other side." Lawrence Mentz, *Voluntary Dismissal by Order of Court— Federal Rules of Civil Procedure Rule 41(a)(2) and Judicial Discretion*, 48 Notre Dame L. Rev. 446, 447 (1972). To that end, "the district court must exercise its broad equitable discretion under Rule 41(a)(2) to weigh the relevant equities and do justice between the parties in each case." *Emergency Recovery, Inc. v. Hufnagle*, 77 F.4th 1317, 1329 (11th Cir. 2023) (citation omitted); *see also, e.g.*, *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 17 F.4th 376, 393 (3d Cir. 2021), *aff'd*, 599 U.S. 419 (2023) (explaining that Rule 41(a)(2) provides district courts with a "'broad grant of discretion' to shape the 'proper' terms of dismissal").

The decision below cannot be squared with that governing framework. This Court already held that the PBA has a "direct, substantial, and legally protectable interest in officer safety." *Payne*, 27 F.4th at 799. And it specifically ordered the district court to allow the PBA to intervene so that it could safeguard this legally "cognizable interest." *Id.* at 804. The PBA then invested substantial resources in this action to try to protect its members, and when the parties disregarded and bargained around the PBA's officer-safety concerns, the PBA vehemently objected. JA439–58. It also submitted expert affidavits from a former NYPD Chief

confirming the "acute risks to the safety of police officers" posed by the Settlement. JA425; *see also* JA976–80. Nevertheless, the district court continued to treat the PBA's interest in officer safety as irrelevant. SA14–15.

That was error. The district court *at least* had to consider whether its order would materially affect the PBA's interest in preserving officer safety. But by limiting the types of "legal prejudice" that it would consider in resolving the Rule 41(a)(2) motion—to the loss of a legal claim, cause of action, or contract right, *see* SA14—the district court breached its obligation to balance the equities and "ensure that substantial justice is accorded to all parties," *Polansky*, 599 U.S. at 437 (citation omitted). Worse, it ignored the very legal interest that intervention was meant to protect.

### B. Nothing in Rule 41(a)(2)'s Text or this Court's Precedent Limits a District Court's Consideration to Exclude the PBA's Legally Protectable Interest.

The district court's explanation for its cramped understanding of Rule 41(a)(2) is likewise untenable. First, the district court suggested that the "legal prejudice" standard derives from "the text of Rule 41(a)(2)." SA16. But courts must "give the Federal Rules of Civil Procedure their plain meaning." *Bus. Guides, Inc. v. Chromatic Comm'cns Enters., Inc.*, 498 U.S. 533, 540 (1991) (citation omitted). And neither the words "legal prejudice" nor anything like them appear in Rule 41(a)(2). "Although the courts talk about 'legal prejudice'" in certain contexts, the

Rule "lays down no specific test" that would limit the courts to such considerations—and certainly not to the three particularized forms of legal prejudice that the district court identified. *Doe v. Urohealth Sys.*, 216 F.3d 157, 163 (1st Cir. 2000); *see Polansky*, 599 U.S. at 437.[6]

Instead, the Rule affords district courts wide latitude to impose "terms" that they "consider[] proper" before permitting a dismissal. Fed. R. Civ. P. 41(a)(2). "Terms" are "conditions under which an action may be undertaken or agreement reached; stipulated or agreed-upon requirements." *New Oxford American Dictionary* 1790 (3d ed. 2010); *see Travers v. Fed. Express Corp.*, 8 F.4th 198, 205 n.15 (3d Cir. 2021). And since the adoption of the Federal Rules of Civil Procedure, the word "terms" has been understood to be "a word of the broadest connotations," embracing "all 'limiting conditions.'" *Shawmut Ass'n v. SEC*, 146 F.2d 791, 795 (1st Cir. 1945) (quoting Oxford English Dictionary, Vol. XI, p. 201). "The Rule thus empowers the district court to either dismiss the case on its own terms"— whatever those requirements may be—"or to deny a requested dismissal, if those terms are not met." *Paysys Int'l, Inc. v. Atos IT Servs. Ltd.*, 901 F.3d 105, 108–09 (2d Cir. 2018).

---

[6] The District Court also briefly "consider[ed] the factors set out" in *Zagano v. Fordham University*, 900 F.2d 12 (2d Cir. 1990). SA40. But those factors, too, "are neither exhaustive nor conclusive," and district courts "should be sensitive to other considerations unique to the circumstances of each case." *Frank v. Crawley Petroleum Corp.*, 992 F.3d 987, 998 (10th Cir. 2021) (citation omitted).

This Court's precedent is not to the contrary. Indeed, the district court relied on several decisions that do not even mention Rule 41. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019); *Bhatia v. Piedrahita*, 756 F.3d 211 (2d Cir. 2014); *Zupnick*, 989 F.2d 93; *cf. Paysys*, 901 F.3d at 109 n.3 ("The legal prejudice language on which it relies, however, is not based on an interpretation of Rule 41(a)(2) . . . ."). Those decisions hold only that "a non-settling defendant *generally lacks standing* to object to a court order approving a partial settlement because a non-settling defendant is *ordinarily* not affected by such a settlement." *Melito*, 923 F.3d at 91 (emphases added) (quoting *Bhatia*, 756 F.3d at 218); *see Zupnick*, 989 F.2d at 98.[7]

In contrast with those cases, the law of this case makes clear that the PBA has standing to object to any agreement that shortchanges officer safety. If the Settlement is approved, the PBA will "suffer[] an invasion of a legally protected interest" in its members' physical safety "that is concrete and particularized and actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation marks omitted). This Court has already held that this is a "legally protectable

---

[7] Other Circuits have similarly assessed a non-settling party's capacity to object under the rubric of "Article III constitutional requirements for standing." *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 92 (1st Cir. 2008); *see also, e.g.*, *New Eng. Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

interest." *Payne*, 27 F.4th at 799; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (explaining that "physical harms" "readily qualify" as cognizable injuries for standing purposes). And the Settlement poses an imminent threat to that concrete and particularized interest by imposing a slew of restrictive conditions that "jeopardize the safety of officers." JA434.

At the same time, there is little doubt that the PBA's injury is "fairly traceable" to the challenged action and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Reversal would deprive the Proposed Settlement of its binding and judicially enforceable effect and return the parties to the status quo. The PBA thus has standing, and the district court had no reason to disregard its interests.

The district court also invoked a pair of this Court's decisions for the proposition that "Rule 41(a)(2) . . . does not authorize a court to review or approve the substantive terms of a settlement." SA12 (citing *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1025 (2d Cir. 1992); *In re Sept. 11 Prop. Damage Litig.*, 650 F.3d 145, 151 (2d Cir. 2011)). But those cases did not interpret Rule 41(a)(2) either. On the contrary, both cited *Rule 41(a)(1)* in dicta to suggest that courts "[t]ypically" play no role in reviewing a settlement's terms. *In re Sept. 11*, 650 F.3d at 150–51 (quoting *In re Masters*, 957 F.2d at 1025). Rule 41(a)(2) differs from Rule 41(a)(1) and provides that parties seeking to voluntarily

dismiss over a non-settling party's objection may do so "only by court order" and "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

Finally, the district court turned to *Camilli v. Grimes*, 436 F.3d 120 (2d Cir. 2006). But *Camilli* did not hold that the few types of legal prejudice identified by the district court provide the only bases for objection by a non-settling party. It did not even hold that legal prejudice is required—only that "plain legal prejudice" provides an *example* of "a circumstance that would defeat dismissal of a plaintiff's suit without prejudice." *Id.* at 124 (quotation marks omitted). In all events, the PBA here would suffer "plain legal prejudice" based upon the threatened harm to officer safety resulting from the Settlement. *See* JA425–38, 976–80; *infra* Section II.C.1.

\* \* \*

"In sum, the district court was obligated to consider the novelty of the circumstances surrounding this case" before it could authorize dismissal. *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997). It did not do so. And the PBA's concerns—for both the safety of its members and of the public—undoubtedly "militate[] against dismissal" on the terms provided by the Settlement. *Polansky*, 599 U.S. at 437. Accordingly, this Court should reverse the district court's Order granting dismissal over the PBA's objections.

## II.  The District Court Erred in Approving the Consent Decree over the PBA's Objections.

The district court also erred several times over in approving the consent decree.  The court applied an erroneous legal standard for reviewing the proposed consent decree, abdicated its judicial responsibility to ensure that the terms were fair and reasonable, and provided a judicial stamp upon an unprecedented policing experiment that will foreseeably pose serious threats to the safety of police officers and the public alike.

### A.  The District Court Applied the Wrong Standard by Refusing To Consider the PBA's Interests when Assessing Whether the Consent Decree is Fair and Reasonable.

A consent decree is a court-approved settlement, like this one, "that contains an injunction."  *In re Masters*, 957 F.2d at 1025; *see* SA20.  An injunction backed by the court's contempt power "is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  And the moving party bears the burden of showing that it should issue.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Thus, when a district judge is presented with a proposed consent judgment, she cannot act "merely [as] a 'rubber stamp.'"  *SEC v. Levine*, 881 F.2d 1165, 1181 (2d Cir. 1989).  Her approval lends "the imprimatur of the court, which invests the decree with the integrity of the judiciary and signifies the court's willingness to implement the solution of the parties."  *Kozlowski v. Coughlin*, 871 F.2d 241, 245

31

(2d Cir. 1989). As a result, the court must exercise its equitable authority to ensure that the proposed settlement's terms are not "unfair, inadequate, or unreasonable." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991) (quoting *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)).[8]

These concerns are magnified when the proposed consent decree affects third parties. The "collateral consequences of an injunction can be very grave," *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978), and therefore, reviewing courts must play a "larger role" in "any suits 'affecting the public interest,'" *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986) (citation omitted). They must take care to ensure that the "agreement [is] equitable to *all* persons concerned and in the public interest." *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir. 1975) (emphasis added). Put differently, "the district court is obligated to make an examination of how the accord affects the rights of third parties"—"before endorsing a settlement." *In re Drexel Burnham Lambert Grp., Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) (citing *In re*

---

[8] This equitable approach mirrors the law in other Circuits. *See, e.g.*, *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 872 (6th Cir. 2015) ("Before entering a consent decree, a district court must determine, among other things, that the agreement is fair, adequate, and reasonable, as well as consistent with the public interest," and "must allow anyone affected by the decree to present evidence and have its objections heard." (quotation marks omitted)); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (similar, and collecting cases).

*Masters*, 957 F.2d at 1026). And it could hardly be otherwise. The district judge "has the full powers of an equity judge." *Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir. 1985). So "if third parties complain to [her] that a 'decree will be inequitable because it will harm them unjustly, [she] cannot just brush their complaints aside.'" *In re Masters*, 957 F.2d at 1026 (quoting *Donovan*, 752 F.2d at 1176).

But that is precisely what the district court did here. The PBA opposed the consent decree, demonstrating that the Proposed Settlement's terms would materially and adversely affect its interest in preserving officer safety. *See* JA425–58. This Court permitted the PBA to intervene specifically to protect that important interest. *See Payne*, 27 F.4th at 795. Yet, rather than apply the flexible equitable principles this Court has espoused, the district court brushed aside the PBA's concerns and "decline[d] to consider the PBA's arguments addressed to the substantive merits of the proposed Settlement." SA33.

That blinkered approach was patently "inconsistent with traditional equitable principles." *See Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010). And because the district court "based its ruling on an erroneous view" of how it must scrutinize a proposed consent decree, it "necessarily abuse[d] its discretion" by entering it. *Cooter*, 496 U.S. at 405.

33

**B.    The District Court Misconstrued this Court's Decision in *Citigroup*.**

The district court's error resulted from misreading this Court's decision in *Citigroup*, which it believed "specifically proscribed" consideration of the PBA's objections.  SA33.  *Citigroup* did not confront a consent decree that implicated the interests of a non-settling party—much less the asserted safety interests of a party granted intervention specifically to protect that right.  *See Payne*, 27 F.4th at 795.  In fact, this Court explicitly recognized that "the terms of the [*Citigroup*] settlement [did] not have adverse impact on anyone."  *U.S. Sec. & Exch. Comm'n v. Citigroup Global Mkts, Inc.*, 673 F.3d 158, 166 n.5 (2d Cir. 2012) (per curiam).  Rather, *Citigroup* was a case in which the district court's initial decision amounted to second-guessing the SEC's exercise of enforcement discretion.  *See Citigroup*, 752 F.3d at 297.  In that context, the Court set forth a general standard for "evaluating a proposed S.E.C. consent decree" that was opposed by no party.  *Id.* at 294.

Specifically, the Court held that a district court must "determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the public interest would not be disserved" if "the consent decree includes injunctive relief."  *Id.* (quotation marks omitted).  The Court "omit[ted] 'adequacy' from the standard," at least in that case where no third party would be adversely affected, because it was "inapt in the context of a proposed S.E.C. consent decree."  *Id.*  And it set forth a list of "minimum" considerations for a district court to assess.  *Id.*  This

34

Court expressly recognized, however, that the inquiry is a flexible one: "Consent decrees vary, and depending on the decree a district court may need to make additional inquiry to ensure that the consent decree is fair and reasonable." *Id.* at 295; *see also id.* at 296 (observing that a court must "consider[] the balance of hardships" between the parties before deciding whether "a remedy in equity is warranted" (quoting *eBay*, 547 U.S. at 391)).

Nevertheless, the district court mechanically applied *Citigroup*'s "minimum" considerations as though they were an exhaustive checklist that excluded any consideration of the interests of objecting parties. *See* SA27–31. That rigid inquiry failed to account for the PBA's valid concerns in protecting officer safety. And it thus represented a stark departure from the district court's proper role in issuing injunctive relief. The "essence of equity jurisdiction," after all, is the power of courts "to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). "Flexibility rather than rigidity has distinguished it." *Id.*; *accord Clark v. AII Acquisition, LLC*, 886 F.3d 261, 266 (2d Cir. 2018) ("Equity eschews mechanical rules." (citation omitted)). And nothing in *Citigroup* purports to hamstring district courts from considering the substantive objections of a party to the proceeding when exercising that discretion. A district judge can always "disapprove" a proposed consent decree "unless a certain term that [she] thought appropriate were included." *Levine*, 881 F.2d at 1181; *see United States v. City of*

*Albuquerque*, 2020 WL 3129825, at *69 (D.N.M. June 12, 2020) ("Of course, the Court could reject the Original Settlement Agreement based on the Officers Association's Objections."). To that end, the district judge here should have "carefully scrutin[ized]" the consent decree's "terms," which will "unreasonabl[y]" and materially impair the cognizable safety interests of the PBA's members. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (Rubin, J., controlling opinion). She failed to do so only because she misconceived the proper standard of review.

Blindly transplanting *Citigroup*'s minimum requirements to this case would not only violate basic principles of equity, but it would also raise serious federalism concerns. Unlike in *Citigroup*, the district court has now "place[d] the power and prestige" of a federal court behind a controversial experiment that will guide local policing. *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

Worse yet, it did so without a finding that the prior rules had, or likely would, lead to constitutional violations and without any sustained consideration—much less any factual findings—related to the critical safety interests that the decree may jeopardize. The court instead, under the threat of judicial contempt, locked in an ill-advised NYPD policy that will be "binding on successor public officials." *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester County*, 712 F.3d 761, 771 (2d Cir. 2013). By doing so, the district court has needlessly risked

36

"depriv[ing] future officials of their designated legislative and executive powers." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (suggesting that federal consent decrees which constrain the discretion of state officials should be "limited to reasonable and necessary implementations of federal law").

In short, "when a consent decree contains injunctive provisions or has prospective effect, the district court must be cognizant of and sensitive to equitable considerations." *Ibarra v. Tex. Employment Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987); *see Drexel Burnham Lambert*, 995 F.2d at 1146; *Patterson*, 514 F.2d at 771. But the district court sacrificed those considerations by treating *Citigroup* as setting forth a mechanical test—despite *Citigroup*'s disavowal of any such hardline framework. The court therefore erred in disregarding the PBA's submission concerning the problematic aspects of the consent decree—despite this Court's prior acknowledgement that the Settling Parties may not adequately protect the PBA's "substantial" and "legally protectable" interest in preserving officer safety. *Payne*, 27 F.4th at 799, 803–04.

## C. The District Court Erred in Holding that the Consent Decree Would Not Disserve the Public Interest.

The district court's assessment of the public interest was also critically flawed. New Yorkers "ha[ve] a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting [their] property rights." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994).

That much cannot be disputed. And those interests can and should be preserved alongside the public's First Amendment rights to speak and protest.

But the First Amendment does not sanction violence or breach of the peace. *See, e.g.*, *Jones v. Parmley*, 465 F.3d 46, 56–57 (2d Cir. 2006). "Although sidewalks are generally open . . . for 'expressive activities,'" the public has a "'significant'" countervailing interest in "maintaining public safety and order," and in "'keeping . . . public spaces safe and free of congestion.'" *Kass v. City of New York*, 864 F.3d 200, 208 (2d Cir. 2017) (citation omitted). That is particularly true "in a city with eight million inhabitants," where even minor disturbances can lead to chaos and gridlock. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 100 (2d Cir. 2006). In addition, the public has a compelling interest in ensuring "effective law enforcement," *United States v. Napolitano*, 761 F.2d 135, 139 (2d Cir. 1985), and in maintaining "the safety of NYPD officers," *Dinler v. City of New York (In re City of New York)*, 607 F.3d 923, 950 (2d Cir. 2010); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting the public's "weighty interest in officer safety").

### 1. The Consent Decree Threatens Officer and Public Safety.

The Settling Parties' agreement jeopardizes these vital public interests in multiple ways. To start, the consent decree restricts the ability of NYPD officers to enforce the law. Incredibly, it requires officers to obtain "approval of someone at the rank of Captain or above"—a group that comprises less than 3% of the

Department—before arresting any individual who has committed "Red Light" offenses. JA387. And many of those offenses are serious. They range from "riot" and "incitement to riot," to "violation of emergency orders, disorderly conduct, trespass, criminal mischief 3 or 4," and "unlawful assembly." *Id.*

The consent decree thus cements a radical policy that "prevent[s] the police from acting appropriately in real time during a fluid event." JA431. And it provides for no exceptions. *See* JA387, 431. Prior approval is always required before an officer can "restrain[]" or "seiz[e]" an offender, "whether or not by physical force." *Merriam Webster's Dictionary of Law* 32 (2016) (defining "arrest"). That includes instances where a person "engages in tumultuous and violent conduct" with a group "and thereby intentionally or recklessly causes or creates a grave risk of causing public alarm," N.Y. Penal Law § 240.05 (riot in the second degree), even if that conduct results in "physical injury or substantial property damage," *id.* § 240.06(1) (riot in the first degree). It includes instances where a person "knowingly enters or remains unlawfully in a building" with a firearm, explosive, or other deadly weapon. *Id.* § 140.17 (criminal trespass in the first degree). And it includes a range of other instances where a person engages in criminal violence or destruction. *See id.* § 240.20 (defining disorderly conduct to include "engag[ing] in fighting or in violent, tumultuous or threatening behavior" that intentionally or recklessly causes public inconvenience); *id.* § 240.10 (defining unlawful assembly as gathering with

39

others "for the purpose of engaging or preparing to engage with them in tumultuous and violent conduct likely to cause public alarm"); *id.* § 145.00 (defining mischief 4 to include "[i]ntentionally damag[ing] property of another person"); *id.* § 145.05 (defining mischief 3 to include certain instances of "damag[ing] the motor vehicle of another person, by breaking into such vehicle when it is locked with the intent of stealing property").

Simply put, the consent decree allows riotous individuals to commit these serious offenses right in front of NYPD officers and then flee into the chaos of demonstrations before the officers have a realistic chance of obtaining the senior approval necessary to effectuate an otherwise lawful arrest. This will inevitably reduce deterrence and "increase the risk of violence." JA431. And it will significantly undermine the "legitimate and compelling" public interest in enabling police officers to "protect[] the community from crime." *Schall v. Martin*, 467 U.S. 253, 264 (1984) (quotation marks omitted).

The consent decree's rigid tiered-response framework is equally problematic. It dramatically "limit[s] police actions, delay[s] police response, and limit[s] numbers of and equipment available to officers deployed." JA430; *see* JA389–94. In so doing, it ignores the simple reality that protests involving large and angry crowds may degenerate rapidly and unpredictably into violence and chaos. JA431– 34. As New York City's Mayor recognized when recounting the "troubling" and

40

"problem[atic]" terms of the Settlement, "[t]hese are very volatile situations." JA982–83. The consent decree also ignores the obvious fact that maintaining a visible police presence in advance of a riot may help deter the riot from breaking out in the first instance. JA431–33.

The PBA made these common-sense points below and supported them with Chief Anemone's 35 years of experience. JA426–27, 430–34. The history of the summer 2020 protests reinforces how demonstrations can rapidly "degenerate into a mob or riot." JA437. And, unfortunately, the violence occasioned by those protests was not anomalous. It has become increasingly common, as we saw repeatedly during the recent protests that have raged across the country following Hamas's terrorist attacks on October 7 and Israel's subsequent invasion of Gaza. *See, e.g.*, Summer Concepcion, *Biden Condemns Campus Violence: 'Order Must Prevail'*, NBC News (May 2, 2024), https://nbcnews.to/3UwNHwq; *see also, e.g.*, Adrienne LaFrance, *The New Anarchy: America Faces a Type of Extremist Violence it Does Not Know How to Stop*, The Atlantic (Mar. 6, 2023), https://bit.ly/3USGybc (recounting the 2020 events in Portland that "seemed from the outside to be spontaneous protests" but were "in fact the culmination of a long-standing ideological battle" that resulted in widespread violence).

The consent decree promotes these sorts of violent and destructive protests. As Chief Anemone explained, delaying response so that an off-scene Senior

Executive can "decide what tactics and tier should be utilized in the field" will "[p]resent a significant risk of serious injury to police officers, protestors, and the public." JA426. And those risks "are further compounded when the Senior Executive must manage multiple requests, from multiple Incident Commanders, from multiple protest locations throughout the City, including moving protests, occurring at night, involving violence, and using multiple staging locations." *Id.* But the consent decree requires that "cumbersome" and bureaucratized structure. JA435. It forces the NYPD to be reactive instead of proactive and "undercuts the ability of an incident commander to take rapid decisive action" when problems arise. JA431. That is plainly against the public interest. "Rather than responding to an incident after it has boiled over, appropriate deployment of police resources at the earliest possible moment significantly decreases the odds of violence occurring." *Id.*

Beyond that, the consent decree generally compels the NYPD, "whenever possible," to "accommodate [a] demonstration" that "blocks vehicular or pedestrian traffic or otherwise obstructs public streets or sidewalks." JA390. This too "creates the risk of a dangerous situation when protesters meet vehicles or pedestrians who come upon the event unknowingly." JA436. And Mayor Adams recognized this problem as well, emphasizing that protestors should not "be able to just take over our streets." JA982; *see Kass*, 864 F.3d at 208.

42

##### 2. The District Court Wrongly Believed that It Had To Defer to the Settling Parties when Assessing the Public Interest.

The district court remarkably concluded that this extensive evidence of harm to the public is "not properly considered" in examining the public interest. SA36. In its view, the fact that "multiple governmental bodies" had signed on to the Settlement was "effectively dispositive" of the inquiry. SA34. But this Court has never felt bound to "accept the Government's unequivocal assumption as to where the public interest lies," *United States v. Doe (In re Grand Jury Investigation)*, 399 F.3d 527, 534 (2d Cir. 2005), much less the view of *state* government actors seeking a *federal* consent decree.

Nor would that make any sense. "Consent decrees entered in federal court must be directed to protecting federal interests." *Frew*, 540 U.S. at 437. And "overreaching consent decrees, even with governmental blessing, may impermissibly enlist the federal courts into excessive supervision of state government." *Johnson v. Lodge # 93 of the Fraternal Order of Police*, 393 F.3d 1096, 1110 (10th Cir. 2004).

The district court's deference to the Settling Parties makes even less sense in the context of this case, where this Court had permitted the PBA to intervene and speak for the safety interests of 21,000 police officers, and senior City leaders have been all over map when it comes to the Settlement Agreement.

43

Although the City's lawyers have approved the Settlement Agreement, Mayor Adams himself publicly stated that the Settlement is a "problem" and that he "did not agree [with] the concept of the changes" embodied in the consent decree. JA982–83. He thought that its terms steered the City in "a very troubling direction." JA982. And he lamented that "[a]nyone who polices [New York City] should be concerned about what's in the settlement." JA983.

Mayor Adams was not alone. A bipartisan group of City Council members also urged the district judge "to reject the proposed settlement," because "it would jeopardize the safety of the public and [NYPD] officers" and "have a far-reaching, long-term negative impact on New York City." City Council Members' Letter, *supra*. In their words, "[t]he sum total of these new procedures would be to make [the] city a more dangerous, and frankly, undesirable place." *Id.*

The district judge received this pushback from New York City's leadership. But she candidly admitted that she was "not interested in the statements that were made by the mayor" or "the letter that came out from the city councilmen." JA990. She was interested only in the views of the public officials who supported the Settlement. *See* SA34. That is not what *Citigroup*—or any other precedent— requires.

44

3.   **To the Extent the District Court Considered the Public Interest, the Court Erred by Resolving a Battle of the Experts Without Factual Findings or an Evidentiary Hearing.**

Having improperly loaded the dice, the district court ultimately determined that the PBA's evidence, including Chief Anemone's expert opinion, could not "overcome the great deference" it mistakenly thought it was "required to grant the Settling Parties." SA36. Under any standard, though, that conclusion was untenable. Chief Anemone submitted his opinion "based on [his] 35 years of experience planning, staffing, training, attending, supervising and critiquing the NYPD's response to public protests," and he stated that his "consulting and teaching experiences" since retiring from the NYPD have required him to "keep abreast of the most recent learning and practices with respect to the policing of protests." JA425, 977. That "extensive experience" led Chief Anemone to "recognize [the] acute risks to the safety of police officers, protestors, and other members of the public, should the Proposed Settlement be approved." JA425. Nevertheless, the district court believed that Chief Anemone's opinion could not provide a "substantial basis" as a matter of law for rejecting the proposed consent decree. SA36.

The court then buttressed its decision to defer to the Settling Parties by discussing the declaration of Plaintiffs' expert, Hassan Aden, the former chief of police of the Greenville, North Carolina Police Department, *see* SA34, 37, who never served on the NYPD and had little familiarity with New York's history in

45

policing protests, *see* JA978–79. Remarkably, the district court credited Plaintiffs' expert over the opinion of Chief Anemone, even though the court neither heard live testimony from the experts nor conducted any kind of evidentiary hearing into the novelty of the policing practices reflected in the consent decree.

The district court plainly could not credit Plaintiffs' expert over that of the PBA's without conducting an evidentiary hearing. As this Court has recognized, a "district court generally should conduct an evidentiary hearing before making factual findings" if a party's sworn factual averments are "disputed." *Doe v. United States*, 76 F.4th 64, 70 (2d Cir. 2023) (quotation marks omitted). And here, even the district court noted that the dueling experts' opinions stood in "direct contradiction." SA37. This "existence of factual disputes necessitate[d] an evidentiary hearing." *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) (citation omitted). But in forging ahead to issue the consent decree, the district court "merely show[ed] a preference for 'one piece of paper to another.'" *Forts v. Ward*, 566 F.2d 849, 851–52 (2d Cir. 1977) (citation omitted). That would have been problematic in any circumstance. Yet the stakes are all the higher here because crediting Chief Aden's opinion over Chief Anemone's on the basis of a cold record led the district court to lock in a flawed policing experiment that will haunt the City for years to come.

Finally, the district court observed that "the PBA would have had no ability to stop" the NYPD from implementing the "proposed tiered response structure" if

its leadership chose to adopt it outside of the litigation context.  SA36; *see also* SA18.  But the district court's counterfactual neglects the important fact that the entry of a consent decree is far different from an ordinary change in policy by local officials.  A consent decree not only places the power, prestige, and resources of the federal judiciary behind the reform, but it renders the new policies extremely difficult to abandon or to adjust if the NYPD chose to rethink this experiment.

That is why, "having 'call[ed] upon the power of the courts in ordering a consent decree and issuing an injunction,' the [Settling Parties] must demonstrate that it is fair and reasonable and that it does not disserve the public interest."  *United States v. New York City Hous. Auth.*, 347 F. Supp. 3d 182, 212 (S.D.N.Y. 2018) (first alteration in original) (quoting *Citigroup*, 752 F.3d at 212).  That they failed to do.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's dismissal and entry of the consent decree and remand for further proceedings.

Respectfully submitted,

/s/ Steven A. Engel

| | |
|---|---|
| BRIAN A. KULP | STEVEN A. ENGEL |
| DECHERT LLP | DECHERT LLP |
| Cira Centre | Three Bryant Park |
| 2929 Arch Street | 1095 Avenue of the Americas |
| Philadelphia, PA 19104 | New York, NY 10036 |
| Tel: (215) 994-2290 | Tel: (212) 698-3512 |
| brian.kulp@dechert.com | steven.engel@dechert.com |

*Counsel for Intervenor-Defendant-Appellant*
*Police Benevolent Association of the City of New York, Inc.*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of 2d Cir. R. 32.1(a)(4)(A) because it contains 11,023 words, excluding those portions of the Brief exempted by Fed. R. App. P. 32(a)(7)(B). The Brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: May 30, 2024

*/s/ Steven A. Engel*
STEVEN A. ENGEL
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3512
steven.engel@dechert.com

*Counsel for*
*Intervenor-Defendant-Appellant*
*Police Benevolent Association of the*
*City of New York, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I caused the foregoing Brief, Special Appendix, and Joint Appendix to be filed using the Second Circuit ACMS system, which automatically served all parties registered with the electronic filing system.

In addition, I served the foregoing materials via email upon those individuals listed below:

**Christopher Thomas Dunn**
New York Civil Liberties Union
125 Broad Street, 17th floor
New York, NY 10004
(212) 344-3005
Fax: (212) 344-3318
Email: cdunn@nyclu.org

**Corey Stoughton**
Selendy Gay Elsberg
1290 Avenue of the Americas
New York, NY 10104
212-390-9036
Email: cstoughton@selendygay.com

**Daniel Ross Lambright**
New York Civil Liberties Union
125 Broad Street
Ste 19
New York, NY 10004
212-607-3341
Email: dlambright@nyclu.org

**Jennvine Wong**
Legal Aid Society
199 Water Street
New York, NY 10038
646-522-9083
Fax: 646-449-6017
Email: jwong@legal-aid.org

**Jessica Perry**
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10024
212-607-3323
Fax: 212-607-3318
Email: jperry@nyclu.org

**Margaret Hadley**
58 St Marks Pl
Ste 411
Brooklyn, NY 11217
484-557-6539
Email: mh4012@columbia.edu

**Paula Garcia Salazar**
The Legal Aid Society of New York
Special Litigation Unit
199 Water Street
6th Floor
New York, NY 10038
703-728-5773
Email: pgarciasalazar@legal-aid.org

**Perry Grossman**
New York Civil Liberties Union
125 Broad St. 19th Floor
New York, NY 10004
(212) 607-3300
Fax: (212) 607-3318
Email: pgrossman@nyclu.org

**Philip Louis Desgranges**
Legal Aid Society
Criminal Defense Practice
199 Water Street
New York, NY 10038
212-577-3398
Email: PDesgranges@legal-aid.org

**Rigodis Appling**
Legal Aid Society
49 Thomas Street
New York, NY 10013
646-634-9812
Email: rtappling@legal-aid.org

**Robert Andrew Hodgson**
New York Civil Liberties Union
125 Broad St. 19th Floor
New York, NY 10004
(212)-607-3317
Email: rhodgson@nyclu.org

**Veronica Salama**
New York Civil Liberties Union
125 Broad St.
19th Floor
New York, NY 10004
212-607-3300
Email: vsalama@nyclu.org

**Molly Knopp Biklen**
New York Civil Liberties Union
125 Broad St.
New York, NY 10004
212-607-3380
Email: mbiklen@nyclu.org

**Abigail Bain Everdell**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
(212)-603-6468
Email: AbigailEverdell@dwt.com

**Alexandra Settelmayer**
Davis Wright Tremaine LLP
1251 Avenue of the Americas
New York, NY 10020
212-402-4070
Email:
alexandrasettelmayer@dwt.com

**Alicia Calzada**
Alicia Calzada
926 Chulie Dr., suite 16
San Antonio, TX 78216
210-825-1449
Email: alicia@calzadalegal.com

**Kathleen Farley**
Davis Wright Tremaine LLP
1251 Avenue of the Americas
New York, NY 10020
212-489-8230
Fax: 212-489-8340
Email: kathleenfarley@dwt.com

**Mickey H Osterreicher**
National Press Photographers
Association
40 Wagon Wheel Drive
East Amherst, NY 14051
716-688-7800
Fax: 716-608-1509
Email: mickeyo@lawyer.com

**Nimra Azmi**
Davis Wright Tremaine LLP
1251 6th Avenue, 21st Floor
New York, NY 10020
212-402-4072
Email: nimraazmi@dwt.com

**Robert D. Balin**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
212 489-8230
Fax: 212 489-8340
Email: robbalin@dwt.com

**Wylie M. Stecklow**
Wylie Stecklow PLLC
Carnegie Hall Tower
152 W. 57th Street
Ste 8th Floor
New York City, NY 10019
212-566-8000

Fax: 212-202-4952
Email: ecf@wylielaw.com

**Gregory Morril**
New York State Office of the
Attorney General
28 Liberty Street
Ste 14th Floor
New York, NY 10005
212-416-6020
Email: gregory.morril@ag.ny.gov

**Lillian Marie Marquez**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-6401
Email: lillian.marquez@ag.ny.gov

**Morenike Fajana**
Naacp Ldf
40 Rector Street
New York, NY 10006
646-891-6448
Email: mfajana@naacpldf.org

**Philip Levitz**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-6325
Email: philip.levitz@ag.ny.gov

**Travis William England**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-6233
Email: travis.england@ag.ny.gov

**Colleen Kelly Faherty**
NYS Office of the Attorney General
28 Liberty Street, 15th Floor
New York, NY 10005
(212)-416-6046
Fax: (212)-416-6009
Email: colleen.faherty@ag.ny.gov

**Jaclyn Hillary Grodin**
Goulston & Storrs
730 3rd Avenue
12th FL
New York, NY 10017
212-878-5053
Email: jgrodin@goulstonstorrs.com

**John Anthony Marsella**
NYS Office of the Attorney General
Rochester Regional Office
144 Exchange Blvd., Suite 200
Rochester, NY 14614
585-327-3225
Email: john.marsella@ag.ny.gov

**Lois Teresa Saldana**
NYS Office of The Attorney General
28 Liberty Street
NY, NY 10005
646-808-4422
Email: lois.saldana@ag.ny.gov

**Swati Roopa Prakash**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-4601
Email: Swati.Prakash@ag.ny.gov

**Remy Green**
Cohen & Green P.L.L.C.
1639 Centre Street
Suite 216
11385
Ridgewood, NY 11207
929-888-9480
Fax: 929-888-9457
Email: remy@femmelaw.com

**Aymen A. Aboushi**
The Aboushi Law Firm
1441 Broadway
5th Floor
New York, NY 10018
212-391-8500
Fax: 212-391-8508
Email: aymen@aboushi.com

**Tahanie Ahmad Aboushi**
The Aboushi Law Firm
1441 Broadway, Ste 5036
New York, NY 10018
212-391-8500
Fax: 212-391-8508
Email: tahanie@aboushi.com

**Dara Lynn Weiss**
City of New York Law Department
100 Church Street
New York, NY 10007
212-356-3517
Fax: 212-788-9776
Email: WeissDara@gmail.com

**Joseph Makoto Hiraoka, Jr.**
New York City Law Department
100 Church Street
Ste 3-219
New York, NY 10007
212-356-2413
Email: jhiraoka@law.nyc.gov

**Amy Robinson**
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-3518
Fax: (212) 356-3509
Email: arobinso@law.nyc.gov

**Bridget Veronica Hamill**
100 Church Street
Ste 2-119
New York, NY 10007
212-356-2394
Email: bhamill@law.nyc.gov

**Jenny Sue-Ya Weng**
New York City Law Department
100 Church Street
Room 3-173b
New York, NY 10007
212-356-2648
Fax: 212-356-3509
Email: jweng@law.nyc.gov

**Omar Javed Siddiqi**
New York City Law Department
100 Church Street
New York, NY 10007
212-356-2345
Email: osiddiqi@law.nyc.gov

**Peter Justin Scutero**
New York City Law Department
New York
100 Church Street
New York, NY 10007
212-356-2410
Email: pscutero@law.nyc.gov

**Tobias Eli Zimmerman**
City of New York Law Department
100 Church Street
New York, NY 10007
(212) 356-2661
Fax: (212) 356-3509
Email: tzimmerm@law.nyc.gov

**Andrew C Quinn**
The Quinn Law Firm, PLLC
399 Knollwood Road
Suite 220
White Plains, NY 10603
914-997-0555
Fax: 914-997-0550
Email: aquinn@quinnlawny.com

**Lalit Kumar Loomba**
The Quinn Law Firm
399 Knollwood Road
White Plains, NY 10603
914-997-0555
Email: lloomba@quinnlawny.com

**Steven Joseph Bushnell**
The Quinn Law Firm
Suite 220
399 Knollwood Road
White Plains, NY 10603
(860)-227-8540
Fax: (914)-997-0550
Email: sbushnell@quinnlawny.com

**Marykate Acquisto**
The Quinn Law Firm, PLLC
399 Knollwood Rd
Suite 220
White Plains, NY 10603
914-997-0555
Fax: 914-997-0550
Email: macquisto@quinnlawny.com

**Stephen McQuade**
Pitta LLP
120 Broadway, 28th Floor
New York, NY 10271
212-652-3885
Email: smcquade@pittalaw.com

**MacKenzie Fillow**
Corp Counsel's Office
100 Church Street, 6th Floor
New York, NY 10007
212-356-4375
Email: mfillow@law.nyc.gov

**Barbara D. Underwood**
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005
212-416-8016
Email:
barbara.underwood@ag.ny.gov

I also caused an electronic copy of the foregoing documents to be sent via email to the Court's email address (civilcases@ca2.uscourts.gov), and six paper copies of the foregoing documents were sent to the Clerk's Office by overnight mail.

Dated: May 30, 2024

/s/ Steven A. Engel
STEVEN A. ENGEL
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3512
steven.engel@dechert.com

*Counsel for
Intervenor-Defendant-Appellant
Police Benevolent Association of the
City of New York, Inc.*