# 24-695,

# 24-1334, 24-1339, 24-1443

## United States Court of Appeals
## for the Second Circuit

IN RE: NEW YORK CITY POLICING
DURING SUMMER 2020 DEMONSTRATIONS

THE PEOPLE OF THE STATE OF NEW YORK, ADAM GRAY, JARRETT
PAYNE, KAYLA ROLON, COREY GILZEAN, MICHAEL HERNANDEZ,
CHRISTOPHER HUSARY, KEITH CLINGMAN, JONATHAN PECK,
JASON DONNELLY, DIANA ZEYNEB ALHINDAWI,
JEMELL D. COLE, AMR ALFIKY,

*Plaintiff-Appellees*,

(*caption continued on inside cover*)

On Appeal from the United States District Court
for the Southern District of New York

### BRIEF FOR MUNICIPAL APPELLEES

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel
of the City of New York*
Attorney for Municipal Appellees
100 Church Street
New York, New York 10007
212-356-4378 or -0817
mfillow@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
MACKENZIE FILLOW
*of Counsel*

August 29, 2024

*(caption continued from outside cover)*

*against*

BILL DE BLASIO, CITY OF NEW YORK, DERMOT F. SHEA,
TERENCE A. MONAHAN, LARS FRANTZEN, FIERRO, JON BRODIE,
PICHARDO, ALTAMIRANO, ROBERT DIXON, SCOTT HALDEMAN,
EDUARD LUCERO, BRITNEY OWENS, HEMME, ANTHONY POLANCO,
ERIK RODRIGUEZ, PATRICK GROSS, LUIS E. ORTIZ, N. CANALE,
MIGUEL CRUZ, JOSEPH A. TAYLOR, NEW YORK POLICE
DEPARTMENT, THEODORE WELLS, JOHN DOES 1-38, JANE DOES 1-
38, SEAN P. ROBINSON, BRIANNA CARLO, NICHOLAS TERRETT,
LUIGI TIRRO, ADAM MUNIZ, LEONEL GIRON, KEITH GALLAGHER,
GZIM PALAJ, DANIEL SLEVIN, KEITH HOCKADAY,
DANIEL GALLAGHER, ROBERT CATTANI,
CHRISTOPHER RADZINSKI, STEPHEN SPATARO,

*Defendants-Appellees,*

POLICE BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC.,

*Intervenor-Defendant-Appellant,*

SERGEANTS BENEVOLENT ASSOCIATION,

*Intervenor-Defendant,*

JOHN DOES 1-20, JANE DOES 1-20,

*Defendants.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................iii

PRELIMINARY STATEMENT .......................................................1

ISSUES PRESENTED FOR REVIEW ............................................3

STATEMENT OF THE CASE..........................................................3

    A.  The settlement agreed to by the City, the State, and the private plaintiffs after extensive negotiations................4

        1. The latest research on how to prevent violence at protests .........................................................................5

        2. The agreement to use a tiered deployment system and keep military-style equipment out of view whenever possible.......................................................7

    B.  The district court's decision approving the settlement and dismissing the complaint ......................................11

SUMMARY OF ARGUMENT .......................................................13

ARGUMENT .................................................................................15

POINT I.........................................................................................15

    THE PBA FAILED TO DEMONSTRATE ITS STANDING TO PURSUE THIS APPEAL ...............................................15

POINT II .......................................................................................20

    IN ANY EVENT, THE PBA RECEIVED ALL THE PROCESS IT WAS DUE ......................................................20

i

## TABLE OF CONTENTS (cont'd)

**Page**

CONCLUSION ................................................................ 30

CERTIFICATE OF COMPLIANCE ............................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*U.S. ex. rel. Antidiscrimination Ctr. v. Westchester Cnty.*,
  712 F.3d 761 (2d Cir. 2013) ............................................................ 27

*Armstrong v. Adams*,
  869 F.2d 410 (8th Cir. 1989) ........................................................... 16

*Ball v. Dewine*,
  2021 U.S. App. LEXIS 19556 (6th Cir. 2021) ................................. 16

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014) ......................................... 15, 16, 18, 24

*Chesemore v. Fenkell*,
  829 F.3d 803 (7th Cir. 2016) ........................................................... 16

*Cooter & Gell v. Hartmarx*,
  496 U.S. 384 (1990) ......................................................................... 27

*Dep't of Educ. v. Brown*,
  600 U.S. 551 (2023) ......................................................................... 21

*Diamond v. Charles*,
  476 U.S. 54 (1986) ........................................................................... 17

*In re Drexel Burnham Lambert Group*,
  995 F.2d 1138 (2d Cir. 1993) .......................................................... 27

*eBay Inc. v. MercExchange*,
  547 U.S. 388 (2006) ......................................................................... 27

*Eichenholtz v. Brennan*,
  52 F.3d 478 (3d Cir. 1995) .............................................................. 16

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................. 16, 21

*Firefighters v. Cleveland*,
  478 U.S. 501 (1986)................................................................. *passim*

*Floyd v. City of New York*,
  770 F.3d 1051 (2d Cir. 2014) ................................................ 17, 24

*Frew v. Hawkins*,
  540 U.S. 431 (2004)...................................................................... 28

*Hoi Man Yung v. Walker*,
  341 F.3d 104 (2d Cir. 2002) ......................................................... 25

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013)...................................................................... 15

*Ibarra v. Texas Employment Comm'n*,
  823 F.2d 873 (5th Cir. 1987)........................................................ 28

*Indus. Communs. & Elecs. v. Town of Alton*,
  646 F.3d 76 (1st Cir. 2011) .......................................................... 21

*Janus Films v. Miller*,
  801 F.2d 578 (2d Cir. 1986) ........................................................ 27

*Kirkland v. N.Y. State Dep't of Corr. Servs.*,
  711 F.2d 1117 (2d Cir. 1983) ...................................................... 21

*Kozlowski v. Coughlin*,
  871 F.2d 241 (2d Cir. 1989) ........................................................ 26

*LeBlanc v. Tex. Brine Co., LLC*,
  989 F.3d 359 (5th Cir. 2021)........................................................ 16

iv

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*In re Masters Mates & Pilots Pension Plan*,
957 F.2d 1020 (2d Cir. 1992) ......................................................... 27

*Melito v. Experian Mktg. Solutions, Inc.*,
923 F.3d 85 (2d Cir. 2019) ............................................................. 15

*Monsanto v. Geertson Seed Farms*,
561 U.S. 139 (2010)......................................................................... 27

*Murthy v. Missouri*,
144 S.Ct. 1972 (2024)................................................................. 20, 21

*P.R. Dairy Farmers Ass'n v. Pagan*,
748 F.3d 13 (1st Cir. 2014) .......................................... 22, 23, 25, 26

*Patterson v. Newspaper & Mail Deliverers' Union*,
514 F.2d 767 (2d Cir. 1975) ........................................................... 27

*Payne v. City of N.Y.*,
27 F.4th 792 (2d Cir. 2021) (*Payne I*) ..................................... 3, 4, 18

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ............................................................. 27

*SEC v. Citigroup Global Mkts, Inc.*,
673 F.3d 158 (2d Cir. 2012) ........................................................... 26

*SEC v. Citigroup Global Mkts, Inc.*,
752 F.3d 285 (2d Cir. 2014) ................................................. 25, 26, 28

*SEC v. Commonwealth Chem. Sec., Inc.*,
574 F.2d 90 (2d Cir. 1978) ............................................................. 27

*SEC v. Levine*,
881 F.2d 1165 (2d Cir. 1989) ......................................................... 27

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*SEC v. Randolph*,
  736 F.2d 525 (9th Cir. 1984) ........................................... 27

*SEC v. Wang*,
  944 F.2d 80 (2d Cir. 1991) .............................................. 27

*Shields L. Grp., LLC v. Stueve Siegel Hanson*,
  95 F.4th 1251 (10th Cir. 2024) ....................................... 16

*Sierra Club v. North Dakota*,
  868 F.3d 1062 (9th Cir. 2017) ........................................ 23

*Smith v. Arthur Anderson*,
  421 F.3d 989 (9th Cir. 2005) .......................................... 16

*Spokeo v. Robins*,
  578 U.S. 330 ................................................................. 26

*Tachiona v. United States*,
  386 F.3d 205 (2d Cir. 2004) ........................................... 17

*Tenn. Ass'n of HMOs, Inc. v. Grier*,
  262 F.3d 559 (6th Cir. 2001) ............................. 22, 23, 25

*Texas v. New Mexico*,
  144 S. Ct. 1756 (2024) .................................. 21, 22, 24, 25

*United States v. Miami*,
  664 F.2d 435 (5th Cir. 1981) .......................................... 27

*In re Vitamins Antitrust Class Actions*,
  215 F.3d 26 (D.C. Cir. 2000) ......................................... 16

*Young v. Transit Authority*,
  903 F.2d 146 (2d Cir. 1990) ........................................... 27

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Zupnick v. Fogel,*
    989 F.2d 93 (2d Cir. 1993) ............................................................. 16

**Other Authorities**

Anne Nassauer, *Effective Crowd Policing: Empirical*
    *Insights on Avoiding Protest Violence* ............................................. 5

*Crowd Psychology & Public Order Policing,* 27 POLICING:
    AN INTERNATIONAL JOURNAL 558 (2004) ............................................. 5

Federal Rule of Civil Procedure 23(e)(2) ............................................ 28

Federal Rule of Civil Procedure 24(a) ............................................ 3, 14

Federal Rule of Civil Procedure 41(a)(2) ................................. 11, 12, 13

## PRELIMINARY STATEMENT

Plaintiffs brought these actions alleging that the NYPD violated the constitutional rights of protesters at the George Floyd demonstrations in the summer of 2020. After engaging in substantial discovery, plaintiffs and the City of New York reached a settlement agreement, which during the life of the agreement requires the NYPD to follow certain practices that have been successfully implemented across the country—and in parts of New York City itself—to ensure that demonstrators can safely exercise their First Amendment rights. The United States District Court for the Southern District of New York (McMahon, J.), approved the settlement over the objections of intervenor the Police Benevolent Association of the City of New York, Inc. The PBA now appeals.

The appeal should be dismissed for lack of standing. Once other parties have resolved the controversy between them through settlement, a nonsettling defendant like the PBA has standing to challenge the settlement agreement on appeal only if it can show that the agreement will cause it "formal legal prejudice"—a concept that captures the disposition of the party's cause of action, the invalidation of its contractual rights, or something of similar magnitude. The PBA has not alleged, much less established, that it will suffer such prejudice. Its asserted concerns for

the safety of officers, which this Court found sufficient to pass the lower bar for intervention, do not fit the bill.

Even assuming the PBA has standing to pursue this appeal, it still would not be able to challenge the reasonableness of the settlement. Under Supreme Court precedent, a nonconsenting intervenor in the PBA's position has, at most, the right to notice of a proposed settlement and an opportunity to air its objections. And the PBA received that process and much more: it joined in settlement discussions, suggested changes to the agreement, submitted written objections to the proposed agreement, and pressed its views at a settlement approval hearing. Though the district court declined to credit the union's objections, it considered them at the hearing and in a thorough written opinion.

The PBA was not entitled to more. The district court did not err by failing to give the PBA an evidentiary hearing that it never requested and was not entitled to in any event, or by declining its invitation to second-guess the governmental parties' judgments about appropriate policing practices. So if this appeal is not dismissed, this Court should affirm.

## ISSUES PRESENTED FOR REVIEW

1.　　Should this Court dismiss the appeal for lack of standing, where (a) a nonsettling defendant bears the burden of establishing that it will sustain formal legal prejudice as a result of a settlement; and (b) the PBA has not identified, let alone shown, such prejudice?

2.　　In the alternative, should this Court affirm the district court's order approving the settlement agreement, where (a) a nonconsenting intervenor at most has a right to notice and an opportunity to heard; and (b) the PBA received that process and more?

## STATEMENT OF THE CASE

Plaintiffs brought these now-consolidated actions challenging the lawfulness of the NYPD's response to the charged protests that erupted across New York City after a Minneapolis police officer killed George Floyd (Joint Appendix ("A") 1040-1316). All four actions—one initiated by the New York State Attorney General and the remainder by individual protestors—sought injunctive relief (*id.*).[1]

In 2021, this Court held that the PBA was entitled to intervene as of right under Federal Rule of Civil Procedure 24(a). *Payne v. City of N.Y.*, 27 F.4th 792 (2d Cir. 2021) (*Payne I*). The Court found that the

_____

[1] The individual plaintiffs also sought damages, which are not at issue here.

3

union had an "interest in officer safety that may be impaired by the disposition of [these] actions." *Id.* at 799. The Court did not find that the PBA had any other protectable interest, despite the union's gestures to collective bargaining rights and officers' reputations. *Id.* at 799 n.3.

On remand, the PBA answered and asserted defenses to plaintiffs' claims (SDNY 20-08924 ECF Nos. 562-65). But the PBA asserted no claims of its own, and no other party asserted claims against it. Two other unions also intervened: the detectives' and sergeants' unions (SDNY 20-08924 ECF Nos. 585, 591, 600).

### A. The settlement agreed to by the City, the State, and the private plaintiffs after extensive negotiations

All parties—including the PBA—jointly asked the district court to refer the case for mediation, with a focus on injunctive relief (SDNY 20-8924 ECF No. 636). The parties met more than 50 times over the course of 14 months to hash out an agreement (A904). Simultaneously, the parties engaged in extensive discovery, taking nearly 150 depositions, exchanging thousands of pages of documents, and consulting with policing experts (Special Appendix ("SPA") 7-8).

Aware of the risks posed by a trial, plaintiffs and the City agreed to a settlement that incorporates nationally accepted policing practices. The other parties invited the PBA and the other intervening unions to

4

participate in settlement discussions, exchanged drafts of the settlement agreement with each union, and made some changes in response to their joint feedback (SDNY 20-08924 ECF No. 1127 at 14-15). The detectives' and sergeants' unions ultimately signed on to the settlement (A422). The PBA did not.

### 1. The latest research on how to prevent violence at protests

The settlement was informed by current best practices. The old model of policing protests—called the escalated force model—posited that a show of overwhelming force by the police would prevent a crowd from becoming violent (A464, 749). Decades of research have shown this to be wrong (A465-66, 656, 749). *See, e.g.*, Anne Nassauer, *Effective Crowd Policing: Empirical Insights on Avoiding Protest Violence*, 38 POLICING: AN INTERNATIONAL JOURNAL 3 (2015); Stephen Reicher & Clifford Stott, *An Integrated Approach to Crowd Psychology & Public Order Policing*, 27 POLICING: AN INTERNATIONAL JOURNAL 558 (2004). In fact, a police force that looks ready for war tends to inflame tensions and provoke violence rather than preventing it (A465, 566, 749, 807).

Prevailing thought has evolved from the escalated force model to the negotiated management model, which calls for officers to express their intent to facilitate First Amendment activity, rather than try to

5

intimidate protesters (A464, 801). Instead of lining up in riot gear, officers dressed in regular uniforms interact with the crowd and communicate that they are there to help the protesters have their voices heard in safe manner (A464, 566, 656, 804). They use a tiered response system focused on deescalating any conflicts that arise (*id.*). And they often overlook common protest violations like blocking traffic; limit the use of force; and avoid mass arrests (A460, 471, 656, 803).

This strategy is recommended by the President's Task Force on 21st Century Policing and the Police Executive Research Forum (A552, 566, 749-50, 764-78). And police forces across the country—in Baltimore, Boston, Chicago, Cleveland, Oakland, San Francisco, Seattle, St. Louis, and Washington, D.C.—have successfully implemented many of these practices (A804-34).

One of the keys to the success of the negotiated management model is keeping riot police out of view of the protesters (A566, 656, 805-07). The Boston police learned the wisdom of this tactic at the 2004 DNC convention (A804). They kept the riot squad out of the protesters' sight for the first several days, and the demonstrations were peaceful (*id.*). On the last day, the riot squad complained about not participating in the event, and management made "one big mistake": they let the officers march toward the protesters in riot gear (*id.*). The crowd turned

6

violent (*id.*). Since then, Boston keeps riot control officers "out of sight" of any protesters (*id.*).

Another important aspect of the negotiated management model is differentiating between truly violent conduct and civil disobedience-style offenses like blocking traffic or unlawful assembly (A656, 817, 827). Making mass arrests for non-violent conduct can turn otherwise law-abiding protesters against the police (A776-78, 816-18). So long as emergency services can get where they need to go, it is often better for officers to redirect traffic than to escalate a broad conflict with protesters that can fuel perceptions that public voices are being stifled (A827, 834).

### 2. The agreement to use a tiered deployment system and keep military-style equipment out of view whenever possible

The settlement agreement calls for the NYPD to use a red light/green light system that it has already been using in parts of New York City for years (A386-87, 936-38). "Red light offenses" are those that are often associated with large-scale protests, like disorderly conduct, trespass, unlawful assembly, minor property damage, and blocking traffic (A386-87). Officers will make arrests for such offenses only with the approval of a captain or more senior officer (A387). More

7

serious violations and crimes are "green light offenses," and line officers may make arrests for such offenses without management's approval (*id.*). Line offers are informed "at roll call," in advance of a protest, which offenses they should focus on (A937-38).

NYPD management will make deployment decisions using a tier system, exercising its discretion based on observations of the crowd and other intelligence (A389-93). An incident commander and a senior executive with specialized training on the First Amendment will jointly decide which tier applies and document their decisions (A390-93). The NYPD "may move between the tiers as appropriate based on the conditions" (A389).

An uneventful protest will be assessed at tier 1, and officers from the community affairs bureau will be deployed to walk with the crowd and talk to protest leaders about any problems; those officers will wear regular uniforms rather than riot gear (A389-90). If the demonstration "temporarily blocks public streets or sidewalks," officers will accommodate the demonstration "whenever possible" (A390). If "necessary," officers can be deployed to reroute traffic (*id.*). These provisions leave ample room for NYPD management to exercise its discretion to protect the public (A1003, 1008-09).

8

If the incident commander, in consultation with the senior executive, reasonably believes protesters are preparing to commit green light violations—that is, more serious crimes—or if the protest gets so big that it risks obstructing "critical infrastructure"—including highways, bridges, tunnels, railways, subways, schools, and hospitals—management can reroute the protest or upgrade to tier 2 (A390-91). Extra officers may be brought closer to the scene but should be kept out of view "to the extent possible" (A391). The incident commander can also place extra officers at the scene of the demonstration where she reasonably believes that there is a threat of major property damage or violence, and that the additional resources would have a deterrent effect (*id.*).

If there is probable cause to believe that individual protesters are committing green light offenses or red light offenses for which arrests are authorized, management can begin at or move to tier 3 and deploy officers in riot gear if necessary (A391-92). Tier 4 is reserved for widespread green light offenses, riots, or where protesters seek to enter or block sensitive locations like courthouses, medical facilities, police stations, and other government buildings, or where protestors are engaging in criminal trespass in the third degree or higher (A392-93). In tier 4, management can disperse the protest (A393).

9

The agreement includes other terms that reflect current NYPD policy. It provides, for example, that officers will make sure any dispersal order can be heard by the entire crowd, will use pepper spray only in limited circumstances, and will not treat protesters differently based on their message (A384, 393-95).

The agreement will be implemented over four and a half years or so, in phases that include training (phase I), implementation (phase II), and collaborative meetings (phase III) (A405-16). It terminates twelve months after the end of phase II, and no party may ask the court to extend it (A416). The parties may bring some disputes before the court for resolution, with the court's role clearly defined and its supervision subject to presumptive time limits (A413-14; *see, e.g.*, A406 (contemplating that the court can address drafted policies and training materials only if plaintiffs show that they omit or violate "a material term" of the agreement itself)).

The agreement expressly states that it is not intended to infringe on the statutory or collective bargaining rights of police officers (A417-18). Indeed, the agreement does not require the PBA or any other union to do anything. And the PBA does not contest that the NYPD could have adopted these policies outside of this litigation (App. Br. 37).

**B.** **The district court's decision approving the settlement and dismissing the complaint**

The private plaintiffs, the State, and the City jointly asked the district court to dismiss the cases under Federal Rule of Civil Procedure 41(a)(2), which governs voluntary dismissals, and retain jurisdiction to enforce the settlement agreement (A376-79). Plaintiffs submitted an affirmation from a former police chief who has recent experience implementing consent decrees in Baltimore, Chicago, Cleveland, and Seattle (A520-25). That expert opined that the settlement agreement comports with nationally accepted policing practices (A459-68).

The PBA asked the court to disapprove the settlement (A423-37). The PBA submitted an affirmation from a former NYPD chief of department who retired in 1999 and believed the settlement would cause harm to officers, protesters, and the public (A425-38). The former chief adheres to the out-of-date escalated force theory, rejecting the latest research indicating that an overwhelming police presence can unintentionally provoke violence (*see* J431-33). In court, the PBA claimed the tiered deployment system was "totally unwise," specifically objecting to the requirement that management deploy officers based on objective evidence (A992-997). According to the union, officers must be allowed to

11

act on "gut feelings" and "subjective judgments," unconstrained by the objective facts on the ground (A1033-34).

In a thorough opinion, the court approved the settlement (SPA1-41). The court closely considered how the settlement might affect the PBA and determined that it wouldn't (SPA12-15). The agreement does not impact the PBA's collective bargaining rights, prevent it from asserting any claim in the future, or compromise its interests in any way (*id.*) For that reason, the court found that the PBA will not suffer "legal prejudice" as a result of the settlement and therefore had no standing to oppose it (SPA4-5, 12-15). The court rejected the PBA's claim that the right to intervene includes a "super power" to block a settlement, something even an original party would not have the right to do (SPA17).

The court declined to second guess the wisdom of the settlement agreement's substantive provisions (SPA31-35). The court recognized that the City and State—both of which have found settlement to be in the public interest—should decide policy matters, not federal judges (SPA33-34). Moreover, the court recognized, NYPD management is in charge of policy—not the union (SPA19).

The court nonetheless noted that the agreement is consistent with best practices, incorporates guidance the NYPD and other police departments have already been following, and leaves room for the NYPD to

12

exercise judgment (SPA10, 29). The district court observed that if it were proper for the court to weigh in on the substance of the settlement, the court would find that it is in the public interest (SPA36-38). The court credited the opinion of the plaintiffs' expert, who had overseen reforms at four police departments and whose views comported with contemporary research, over the PBA's expert, who retired 25 years ago (SPA36-37). The record showed that the strategy advocated by the PBA's expert was "counterproductive," and that the settlement will result in better trained officers who "respond more appropriately to demonstrators" (SPA38). The court thus rejected his claim that the settlement would make officers less safe (*id.*).

The district court finally found that the agreement is effectively a consent decree, and that it meets this Court's procedural requirements for such a decree (SPA20-30).

## SUMMARY OF ARGUMENT

The PBA lacks standing to pursue this appeal. A long line of authority from this Court provides that, after the other parties to a litigation have resolved their controversy, a nonsettling defendant can appeal and challenge the settlement agreement only if it can show that the agreement will cause it "formal legal prejudice." The PBA brushes this burden aside, arguing that this Court's prior decision addressing

intervention under Rule 24(a) establishes its standing too. But the inquiries are different. Whereas the question at intervention was whether the PBA had a "legally protectable interest," the question now is whether the settlement would cause it "formal legal prejudice," a more demanding concept. And whereas the question at intervention was whether the PBA's interest "may" be impaired by this litigation, the question now is whether the settlement "will" cause formal legal prejudice. The PBA's amorphous interest in officer safety, and the daisy chain of speculation required to infer that the settlement will materially undermine officer safety, is insufficient to establish standing under this Court's precedent.

Standing aside, a second line of precedent—this one originating with the Supreme Court—provides that nonconsenting intervenors in the PBA's position have at most the right to notice of a proposed settlement and an opportunity to air objections. The PBA exercised that right, joining settlement discussions, suggesting amendments to the agreement, submitting objections to the proposed settlement, and appearing at a settlement hearing. The PBA has no right to more.

14

# ARGUMENT

## POINT I

### THE PBA FAILED TO DEMONSTRATE ITS STANDING TO PURSUE THIS APPEAL

Because "Article III demands that an 'actual controversy' persist throughout all stage of litigation," "standing must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (cleaned up). It is often the case that an intervenor without claims of its own will have difficulty establishing standing on appeal where, as here, the other parties to the litigation have already resolved the controversy between them. For example, when a defendant elects not to appeal an adverse judgment, an intervenor may be left without standing to prosecute an appeal. *See, e.g.*, *id.*

Consistent with this broader principle, an established line of precedent from this Court provides that a nonsettling defendant is obliged to establish article III standing before it can pursue an appeal challenging a settlement. *See Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 91 (2d Cir. 2019); *Bhatia v. Piedrahita*, 756 F.3d 211, 217 (2d Cir. 2014). Indeed, a nonsettling defendant presumptively lacks standing to challenge a settlement, as it "is ordinarily not affected by such a

15

settlement." *Bhatia*, 756 F.3d at 218. To pursue such a challenge, a non-settling defendant bears the burden of showing that "it will sustain some formal legal prejudice as a result of the settlement." *Bhatia*, 756 F.3d at 218; *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993).[2]

The Court should be especially wary of finding that the PBA has standing to challenge the settlement agreement here. The Supreme Court has cautioned against taking an approach to standing that would allow police officers to challenge government action that may lead to increased crime. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024). And the PBA's theory of standing—to the extent it has one—is even more attenuated. Meanwhile, this Court has, in a remarkably similar setting, expressed "serious reservations about the prospect of allowing a public-sector union to encroach upon a duly-elected government's discretion to settle a dispute against it," as such an approach would "erode the legitimacy of the democratically-elected representatives of

---

[2] Other circuits agree. *See, e.g.*, *Shields L. Grp., LLC v. Stueve Siegel Hanson*, 95 F.4th 1251, 1289 (10th Cir. 2024); *LeBlanc v. Tex. Brine Co., LLC*, 989 F.3d 359, 365 (5th Cir. 2021); *Ball v. Dewine*, 2021 U.S. App. LEXIS 19556, *9-10 (6th Cir. 2021); *Chesemore v. Fenkell*, 829 F.3d 803, 815 (7th Cir. 2016); *Smith v. Arthur Anderson*, 421 F.3d 989, 998 (9th Cir. 2005); *In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31 (D.C. Cir. 2000); *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995); *Armstrong v. Adams*, 869 F.2d 410, 414 (8th Cir. 1989). To be sure, some of these cases involved original defendants rather than intervening defendants, but that is a distinction without a difference: an intervenor who has been afforded the status of a party has no greater rights than an original party.

16

the people." *Floyd v. City of New York*, 770 F.3d 1051, 1060 (2d Cir. 2014) (citing *Hollingsworth*, 570 U.S. at 715)).

In any case, the PBA has never seriously tried to discharge its burden. The PBA's basic gambit is to argue that this Court's prior decision, in concluding that the union's asserted interest in officer safety gave it a right to intervene, establishes its standing too (*see* App. Br. 28-29). But one conclusion does not follow from the other, because the inquiries for procedural intervention and constitutional standing are distinct in important ways. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) (granting intervention by itself does not confer standing); *Tachiona v. United States*, 386 F.3d 205, 211 (2d Cir. 2004) (same).

With respect, we disagree with this Court's prior ruling that the PBA's concerns about officer safety are a "legally protectable interest" sufficient to support intervention as of right. *See generally* Petition for Rehearing En Banc, No. 21-1316, ECF No. 155. But that aside, this Court should not extend the ruling even further to encroach upon article III. The PBA's asserted interest in officer safety[3] is a far cry from the "formal legal prejudice" that this Court has required of nonsettling

---

[3] While the PBA elsewhere gestures to the public's interest in the rule of law and demonstrators' safety interests, it does not argue that these third-party interests support its own standing (*compare* App. Br. 37-42, *with* App. Br. 28-30).

defendants for constitutional standing in this context. Such prejudice arises "only in those rare circumstances when, for example, the settlement agreement formally strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at trial." *Bhatia*, 756 F.3d at 218. The PBA's contention that the settlement in this case may affect officer safety finds no home in this rarefied air (*see* App. Br. 25-26, 28-29).

The intervention and standing inquiries are distinct in another way that matters. While this Court granted the PBA intervention as of right based on a finding that the union's interest "*may* be impaired" by this litigation, *Payne I*, 27 F.4th at 799, more is required at this stage: that PBA must show that it "*will* sustain some form of legal prejudice as a result of the settlement," *Bhatia*, 756 F.3d at 218 (emphasis added). The PBA has not approached that showing.

Consider first their own statements. According to the PBA, the settlement represents a "novel policing experiment" (App. Br. 21). If one accepts that characterization, it is hard to see how the PBA can also maintain that the threat to officer safety is "actual or imminent, not conjectural or hypothetical." *Bhatia*, 756 F.3d at 218 (cleaned up).

18

But in fact, the PBA's claims of novelty are overblown, and in a way that makes its claim to standing even weaker. Not only have other jurisdictions successfully implemented similar policies, the NYPD itself has applied some of the practices embodied in the settlement in parts of New York City for years (A938, 953-54). Yet the PBA has never presented any evidence that these measures have undermined officer safety.

The PBA's claim to standing reduces to speculation that the policies contemplated by the settlement—if implemented or, for many of the union's objections, if not implemented effectively—may someday lead some third parties to engage in some unlawful activity that may in some way increase the risk officers face in discharging their duties. It fears, for example, that the tier system will prevent officers from responding promptly to events on the ground, leaving them vulnerable when faced with violent conduct (App. Br. 39-40). These fears have no basis in reality. The agreement specifically permits management to use its discretion in moving between tiers, deciding whether to accommodate protesters who block traffic, and bringing extra officers to the scene (A389-91). The PBA gives no reason for this Court to assume management will not providently exercise its discretion to protect the public and officers. And in any event, potential injury caused by unknown future protesters—

19

third parties not before the court—is insufficient to establish standing. *Murthy v. Missouri*, 144 S.Ct. 1972, 1986 (2024).

The PBA is thus left to complain that, if it cannot challenge the settlement now, then this Court's intervention decision is "effectively meaningless" (App. Br. 22). That is not true. The PBA was able to engage in discovery, though it generally chose not to do so (SPA8). And if the case had been litigated on the merits, the PBA would have had the chance to put forward its views on that front. Even as the case moved toward a negotiated resolution, the PBA participated in dozens of settlement discussions and the settling parties adjusted their agreement based on the joint input of the PBA and the two other unions (A904; SDNY 20-08924, ECF No. 1127 at 14-15). Though the PBA's intervention obviously did not end with it getting what it wanted, that hardly renders its ability to intervene meaningless. In any case, having failed to establish formal legal prejudice, the PBA is foreclosed from challenging the settlement agreement on appeal under this Court's precedent.

## POINT II

### IN ANY EVENT, THE PBA RECEIVED ALL THE PROCESS IT WAS DUE

Even if the PBA had standing to pursue this appeal, it still would not have the ability to challenge the reasonableness or wisdom of the

settlement agreement, as it seems to believe. The Supreme Court has set out "the rules that apply when parties wish to settle via consent decree over the objection of a nonconsenting intervenor." *Texas v. New Mexico*, 144 S. Ct. 1756, 1764 (2024) (citing *Firefighters v. Cleveland*, 478 U.S. 501 (1986)). Where, as here, a settlement neither disposes of an intervenor's claims nor imposes enforceable obligations on the intervenor, the intervenor has only a narrow participatory right to "present evidence and have its objections heard." *Firefighters*, 478 U.S. at 529-30. That is because "[i]t has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from the litigation." *Id.* at 528-29.[4]

---

[4] While the PBA may have had such a right below—before the district court had approved the settlement and resolved the controversy between plaintiffs and the City—that does not mean that the PBA now has standing to prosecute an appeal (*see supra* Point I). *Firefighters* predates the recent trend of Supreme Court decisions crystallizing, and generally tightening, the Article III standing inquiry. *See, e.g., Murthy v. Missouri*, 144 S. Ct. 1972, 1985-86 (2024); *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 378-80 (2024); *Dep't of Educ. v. Brown*, 600 U.S. 551, 560-61 (2023). But even in *Firefighters*, the union had a much stronger claim to standing, as the settlement in that employment dispute would change promotion criteria (a bargaining subject) and establish quotas (a zero-sum situation). *See* 478 U.S. at 507-11; *see also Indus. Communs. & Elecs. v. Town of Alton*, 646 F.3d 76, 80 (1st Cir. 2011) (applying *Firefighters* where decree would override intervenors' state-law rights); *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1123 (2d Cir. 1983) (holding union had *Firefighters*-like right where settlement would change terms subject to bargaining—selection procedures and eligibility lists; cited favorably in *Firefighters*).

In this case, the PBA received "all the process that it was due." *Id.* at 529 (cleaned up). The inquiry is a limited one: whether the union had a chance to "present evidence and have its objections heard." 478 U.S. at 529. After all, the principle described in *Firefighters*—and reiterated recently in *Texas v. New Mexico*, 144 S. Ct. at 1764-65—is anchored in procedural due process. *See Firefighters*, 478 U.S. at 529 (holding that "the district court gave the union all the process that it was due"); Brief for Petitioner at i, *Firefighters v. Cleveland*, 1985 WL 670136 (U.S. Dec. 2, 1985) (describing one question presented as "whether a court may, consistent with principles of due process and equal protection, enter a purported consent judgment over the objection of an intervenor"). And the demand of procedural due process is, at its core, the right to adequate notice and a meaningful opportunity to be heard.

Consistent with this understanding, courts applying *Firefighters* have underscored its limits. The "key consideration" is whether the intervenor had "a fair opportunity to present relevant facts and objections to the court, and to counter the opponent's submissions." *P.R. Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014). An intervenor does not have a right to "a live hearing to present witnesses," *id.*, much less a "quasi-trial," *Tenn. Ass'n of HMOs, Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001). Indeed, the district court has the discretion to limit

22

the process in whatever manner it deems appropriate so long as it is in furtherance of reaching a fair decision. *Id.*

Here, the PBA received all the process it was due—and then some. Not only did the union have notice of the proposed settlement, it participated in the settlement negotiations; and while it may not have secured its preferred terms, the settling parties did adjust the agreement based on the joint input of the PBA and two other unions. *But see P.R. Dairy Farmers*, 748 F.3d at 17 (approving settlement even though intervenor "was not involved in the negotiations"). Once an agreement had been reached, the PBA had ample opportunity to present evidence and air its objections—in writing and at a hearing (A423-57, 976-84, 989-1003, 1031-38). And the district court considered the objections, issuing a detailed written opinion explaining why it was nonetheless approving the settlement (SPA12-39). The PBA had notice and opportunity to be heard, and as a nonconsenting intervenor, it was not entitled to more. *See, e.g.*, *P.R. Dairy Farmers*, 748 F.3d at 20 (intervenors had chance to review proposal, submit filings, and participate in hearing); *Sierra Club v. North Dakota*, 868 F.3d 1062, 1066-67 (9th Cir. 2017) (intervenors participated in settlement conferences, submitted comments, and participated in hearing).

23

The inquiry ends there. In establishing "the rules that apply when parties wish to settle via consent decree over the objection of a nonconsenting intervenor," *Texas*, 144 S. Ct. at 1765, the Supreme Court has allowed intervenors to participate in the settlement approval process. This narrow participatory principle does not translate into a sweeping right to unilaterally litigate the substantive merits of a settlement reached between other parties. That road quickly leads to what the Supreme Court has deliberately sought to avoid: enabling "one party … [to] preclude other parties from settling their own disputes and thereby withdrawing from the litigation." *Firefighters*, 478 U.S. at 528-29; *see also Bhatia*, 756 F.3d at 218 (noting that limiting participation of nonsettling defendants preserves "judicial resources" and "advances the policy of encouraging voluntary settlements"); *Floyd*, 770 F.3d at 1060 (expressing "serious reservations about the prospect of allowing a public-sector union to encroach upon a duly-elected government's discretion to settle a dispute against it").

The PBA never addresses how one would craft an administrable process that would allow it to litigate its views while also preserving the other parties' established right to settle their dispute and withdraw from the litigation. Even the PBA seems confused about what it wants. At times, it contends the other parties should be compelled to litigate the

24

merits (*see* App. Br. 36 (faulting district court for not making "a finding that the prior rules had, or likely would, lead to constitutional violations")). That contention is tantamount to a claim that the union can block a settlement, but it just does not have that power. *See Texas*, 144 S. Ct. at 1764; *Firefighters*, 478 U.S. at 529-30. And the contention also overlooks that consent decrees, unlike trials, "are primarily about pragmatism," not the merits. *SEC v. Citigroup Global Mkts., Inc.*, 752 F.32 285, 295 (2d Cir. 2014) (emphasis added).

Other times, the PBA posits that the district court was obliged to hold an evidentiary hearing to ascertain appropriate practices for policing demonstrations (App. Br. 45-47). But the union forfeited that argument by failing to request an evidentiary hearing below. *See Hoi Man Yung v. Walker*, 341 F.3d 104, 112 (2d Cir. 2002). And nothing required the district court to hold an evidentiary hearing even if the PBA had requested one. As a nonconsenting intervenor, the PBA did not have the right to an evidentiary hearing or mini-trial. *See P.R. Dairy Farmers*, 748 F.3d at 20; *Tenn. Ass'n of HMOs*, 262 F.3d at 567.

More to the point, the inquiry that the PBA evidently envisions—a judicial determination as to what are appropriate practices for policing demonstrations—is misconceived at its core. It was entirely appropriate for the district court to defer to the governmental parties' views about

25

policing policies. *See PR Dairy Farmers*, 748 F.3d at 20 (upholding district court's deference to government on policy matter); *cf. Citigroup*, 752 F.3d at 296-97 (determining whether consent decree serves public interest entrusted to enforcement agency); *Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989) (consent decree allows officials to resolve questions "best decided by those with greater expertise than judges"). The PBA may disagree with these policies—even though the detectives' and sergeants' unions both approved of the settlement—but asking a federal judge to override the judgment of the Commissioner and the other governmental parties would present the very "federalism concerns" that the PBA professes to protect (App. Br. 21). The district court properly concluded that the City and State—both of which have found settlement to be in the public interest—should decide policy matters, not federal judges (SPA33-34).

It is also telling that the PBA has never identified an intelligible standard that the district court could have applied to ascertain acceptable practices for policing demonstrations and to make predictive judgments about their impact on officer safety. These are "wholly discretionary matters," and federal judges do not "dictate policy to executive administrative agencies." *SEC v. Citigroup Global Mkts, Inc.*, 673 F.3d 158, 163 (2d Cir. 2012); *see also Spokeo v. Robins*, 578 U.S. 330, 337 (stating

26

the federal judiciary may not intrude on "powers given to the other branches"); *Young v. Transit Authority*, 903 F.2d 146, 161 (2d Cir. 1990) (deferring to government on best way to keep the subway safe). That may explain why the PBA does not cite a single case where any court second-guessed a policy change agreed to by a government in a consent decree. Most of the cases it cites do not involve consent decrees at all.[5] Others address the conduct of private sector entities.[6] Only three involved governmental defendants, none of which considered the merits of any policy change. *U.S. ex. rel. Antidiscrimination Ctr. v. Westchester Cnty.*, 712 F.3d 761, 765 (2d Cir. 2013) (affirming finding that county violated consent decree); *United States v. Miami*, 664 F.2d 435, 436 (5th

---

[5] *See Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 144 (2010) (reversing injunction imposed by district court); *eBay Inc. v. MercExchange*, 547 U.S. 388, 390 (2006) (finding that the traditional test for injunctions applies to patent disputes); *Cooter & Gell v. Hartmarx*, 496 U.S. 384, 388 (1990) (addressing Rule 11 sanctions); *Salinger v. Colting*, 607 F.3d 68, 70 (2d Cir. 2010) (finding that the traditional test for injunctions applies to copyright disputes); *Janus Films v. Miller*, 801 F.2d 578, 583 (2d Cir. 1986) (distinguishing between consent judgments and settlement judgments); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 94 (2d Cir. 1978) (partially reversing injunction imposed after bench trial).

[6] *In re Drexel Burnham Lambert Group*, 995 F.2d 1138, 1141 (2d Cir. 1993) (affirming approval of disgorgement plan involving inventor of junk bonds); *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1023 (2d Cir. 1992) (reversing approval of class action settlement involving investment company); *SEC v. Wang*, 944 F.2d 80, 81-82 (2d Cir. 1991) (considering a plan for a corrupt investor to disgorge profits); *SEC v. Levine*, 881 F.2d 1165, 1168 (2d Cir. 1989) (same); *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 769 (2d Cir. 1975) (considering changes to private sector union's hiring hall practices); *SEC v. Randolph*, 736 F.2d 525, 527 (9th Cir. 1984) (approving consent decree addressing SEC violations).

Cir. 1981) (reversing consent decree to the extent that it modified union's collective bargaining agreement without consent); *Ibarra v. Texas Employment Comm'n*, 823 F.2d 873, 879 (5th Cir. 1987) (state entity's mistake about federal law grounds for voiding a consent decree).

To be sure, the district court's review surpassed *Firefighters*, evaluating the fairness, reasonableness, and adequacy of the settlement agreement, but it was not obligated to do so. These are not class actions or enforcement actions brought by an agency exercising statutory enforcement powers, where such an inquiry is expected. *See* Fed. R. Civ. P. 23(e)(2) (class actions); *SEC v. Citigroup Global Mkts, Inc.*, 752 F.3d 285, 292 (2d Cir. 2014) (enforcement actions). Nor does this case involve the situation where a party subject to a consent decree challenges it, in which event a more limited inquiry applies. *Frew v. Hawkins*, 540 U.S. 431 (2004). While the settlement agreement would satisfy these standards too—for the reasons discussed above and those identified by the district court—the dispositive point on this appeal by the PBA is that the union at most had a right to notice and an opportunity to be heard, and it received both. The settling parties are free to resolve their dispute and withdraw from this litigation. The PBA cannot block them.

\*      \*      \*

28

Ultimately, the procedures set out in the settlement are consistent with current best practices and will result in better outcomes without compromising officer safety, as the district court providently found (SPA36-38). Modern research counsels for the use a tiered approach that focuses on illegal conduct requiring an immediate response. The NYPD already sometimes lets protesters block traffic, even if it's technically illegal, and this has not led to chaos. And, at bottom, the wisdom of the policy is not for federal courts to decide.

## CONCLUSION

This Court should dismiss the appeal for lack of standing or, in the alternative, affirm the district court's order approving the settlement agreement and dismissing the consolidated actions.

Dated:   New York, New York
August 29, 2024

Respectfully submitted,

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel*
*of the City of New York*
Attorney for Municipal Appellees

By:   s/MacKenzie Fillow
MACKENZIE FILLOW
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-4378
mfillow@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
MACKENZIE FILLOW
  *of Counsel*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 6,432 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____s/MacKenzie Fillow_____
MACKENZIE FILLOW